588 So.2d 116 (1991)
STATE of Louisiana
v.
Miguel VELEZ, Bernardo Vasquez, and Luis Carlos Quintero-Cruz.
No. CR90-230.
Court of Appeal of Louisiana, Third Circuit.
October 2, 1991.
Writ Denied January 30, 1992.
*120 Robert L. Moore, Moore & Rabin, P.A., Arthur Joel Berger, Miami, Fla., for Quintero-Cruz.
Janice Burton Sharpstein, Richard A. Sharpstein, Sharpstein and Sharpstein, Coconut Grove, Fla., for Velez.
Thomas L. Lorenzi, Lorenzi & Sanchez, Lake Charles, for Vasquez.
Doug Moreau, Dist. Atty., Aaron Brooks, Premila Burns, Asst. Dist. Attys., Baton Rouge, for plaintiff-appellee.
Before DOMENGEAUX, C.J., and STOKER and LABORDE, JJ.
DOMENGEAUX, Chief Judge.
Defendants, Miguel Velez, Bernardo Antonio Vasquez, and Luis Carlos Quintero-Cruz, were charged by an East Baton Rouge Parish grand jury indictment with the first degree murder of Adler B. Seal, a violation of La.R.S. 14:30. Due to extensive pretrial publicity in Baton Rouge, a motion by defendants for change of venue was granted and the matter was transferred to the Fourteenth Judicial District Court in Calcasieu Parish. After a five week trial, the twelve person jury unanimously found each of the defendants guilty of first degree murder. At the penalty phase of the trial, the jury recommended that each of the defendants be sentenced to life imprisonment without benefit of parole, probation or suspension of sentence. The trial court imposed sentence in accordance with the jury's determination. Defendants now appeal their convictions to this court. We will consider all assignments of error that have been briefed. Those which have not been briefed are considered abandoned. Uniform Rules, Courts of Appeal, Rule 2-12.4.

FACTS
On February 19, 1986, Adler B. "Barry" Seal was shot to death with machine gun fire in the parking lot of a Salvation Army halfway house in Baton Rouge. The facts and circumstances leading up to Seal's death appear in the record as follows:
Barry Seal was a pilot and drug smuggler for the Medellin Cartel, a Colombian cocaine enterprise. While employed by the Cartel, Seal flew numerous shipments of cocaine from Colombia to the United States, earning as much as $500,000 per flight. Seal, who was known to the members of the Medellin Cartel as McKenzie, was eventually arrested in connection with his drug smuggling activities. He was indicted in a Florida federal court, tried, convicted, and sentenced to 10 years in a federal prison.
Shortly after Seal was sentenced, he approached the Drug Enforcement Administration with a proposal to cooperate with the government as an informant. The federal government eventually decided to use Seal as an informant, agreeing to advise the sentencing judge of his cooperation at hearings on any motions for reduction of sentence. Pursuant to this agreement, Seal began working as a federal informant in March of 1984.
Richard Gregory, United States Attorney for the Southern District of Florida, testified that Barry Seal was vitally important to the prosecution of drug traffickers, to the extent that many convictions could not have been obtained without his testimony. As a result of Seal's cooperation, indictments were brought against Pablo Escobar and Jorge Ochoa, two of the top men in the Medellin Cartel. Shortly after these indictments were returned in July of 1984, Jorge Ochoa was arrested in Spain. Extradition procedures were begun, and Seal provided the supporting affidavits which were filed in the Spanish courts.
In November of 1984, a documentary entitled "Uncle Sam Wants You" was produced *121 and aired by WBRZ-TV in Baton Rouge. The documentary was prepared by investigative reporter John Camp and outlined Seal's experiences as a drug smuggler and federal informant.
Max Mermelstein, a former drug trafficker and member of the Medellin Cartel, testified that in December of 1984, he attended a meeting at the Miami home of Raphael Cardona-Salazar, another member of the Medellin Cartel. Also present at Cardona-Salazar's residence were the defendant, Miguel Velez (who is sometimes referred to in the record as "Cumbamba," the Spanish word for "chin"), an employee of Fabio Ochoa's named Cano, and several others. Fabio Ochoa had taken over the leadership of the Cartel after Jorge Ochoa was arrested in Spain. Away from the others, Mermelstein, Cardona-Salazar, and Cano watched a video of "Uncle Sam Wants You", and Mermelstein was instructed that he had been selected to take care of Barry Seal. Seal was to be kidnapped and returned to Colombia or killed outright. Either at this meeting or at a second meeting, Fabio Ochoa and Pablo Escobar were contacted by telephone, authorized the contract, and personally thanked Mermelstein for agreeing to take it on.
The price for kidnapping Seal was $1,000,000, while the price for murdering him was $500,000. Mermelstein was chosen to carry out the contract because he was American and would not be noticed in Baton Rouge the way Colombians would. He testified that he accepted the contract out of fear for the safety of himself and his family. Mermelstein was given expense money and a variety of information on Seal's residence, vehicles, restaurants which he frequented, and other personal matters. Pursuant to the contract, Mermelstein made three trips to Louisiana and was unable to locate Seal. He enlisted the help of two men, John Roberts and Bob Dragan, during his trips to Louisiana but was unsuccessful in carrying out the contract.
Mermelstein further testified that another meeting was held in February of 1985, during which discussions were had concerning the contract on Seal. Defendant Velez was present at this meeting. Cardona-Salazar said that he was being pressured by Pablo Escobar and the Ochoas to have Seal eliminated as soon as possible. At the conclusion of this meeting, Velez expressed privately to Mermelstein his displeasure at not being included in the contract on Seal. He inquired as to the details of the contract and expressed interest in obtaining the contract for himself. Velez then stated that he would complete the contract even if it meant taking out Seal's wife and children in the process. Mermelstein advised Velez he had no authority to include him and that the only persons who could do so were Fabio Ochoa, Pablo Escobar, or Raphael Cardona-Salazar. Velez stated that he intended to approach them about being included in the contract, but Mermelstein did not state whether Velez had carried out his intention or if Velez had been given the necessary permission to take over the contract.
Mermelstein noted that Velez was the last person he saw in physical possession of the Mac-10 machine gun which Cardona-Salazar had previously test fired in Mermelstein's home, and which was later used to kill Seal.[1] Before Mermelstein was able to carry out the murder contract on Barry Seal's life, he was arrested for drug smuggling activities and became a government informant protected by the federal government's witness protection program.
Another government witness, Luis Carlos Uribe-Munera, associated with the Medellin Cartel for a number of years, testified that he was asked by a representative of the Ochoa family to go to the United States and kill someone. He did not know the proposed victim's name, but was told that he was the only person who could damage Jorge Ochoa after he was arrested in Spain. Uribe-Munera and another Colombian *122 accepted the contract to kill this witness but later backed out. Shortly thereafter, Uribe-Munera's cohort was murdered and Uribe-Munera himself was shot five times. On cross-examination, Uribe-Munera admitted that he was a revolutionary terrorist and was addicted to crack cocaine or cocaine paste from 1969 until his arrest in 1986. He is currently serving time in a United States federal prison where he takes medication for numerous health problems.
Meanwhile, because of Barry Seal's cooperation with the federal government, his 10-year sentence in Florida was reduced to time served. Pursuant to his agreement with the federal government, Seal pleaded guilty to drug charges in a Louisiana federal court. Lewis Unglesby, Seal's attorney from 1984 until his death, testified that it was his understanding that the agreement provided that Seal could receive no harsher sentence in Louisiana than what the federal court in Florida had imposed.
At Seal's Louisiana sentencing, United States District Judge Polozola recognized Seal's agreement with the government but sentenced Seal to a term of probation, with the condition that he reside in a Baton Rouge Salvation Army halfway house for six months. Seal was required to report to the halfway house at 6:00 p.m. each day, spend the night, and leave the following morning at 7:00 a.m. On January 24, 1986, Barry Seal reported to the halfway house to begin serving his sentence. As feared by Seal's attorney, Seal was murdered three weeks later on February 19, 1986.
The evidence adduced at trial reveals the following activities of the defendants and certain unindicted and indicted coconspirators in the days surrounding the murder of Barry Seal. Airline, hotel, and car rental records indicate that on February 12, 1986, defendant Bernardo Antonio Vasquez took an Eastern Airlines flight from Miami to New Orleans and checked into the New Orleans Airport Hilton. He then rented an Oldsmobile from Avis for a period of seven days. Four days later, on February 16, 1986, defendant Miguel Velez arrived in New Orleans on an Eastern Airlines flight from Miami. Traveling with Velez were Heriberto Sanchez Cardenas and John Jairo Cardona Garcia. Upon arrival, Velez checked into the same Airport Hilton where Vasquez had registered four days earlier. That same day, Vasquez rented another vehicle, a Lincoln Town Car, this time from Budget Car Rental. Meanwhile, defendant Luis Carlos Quintero-Cruz had entered the United States illegally through Mexico. This was revealed by an immigration official who interviewed Cruz subsequent to his arrest.
Shortly after midnight, on February 17, 1986, Vasquez arrived at the Holiday Inn South in Baton Rouge. He was driving a Lincoln Town Car. Vasquez and a companion checked into the hotel and checked out several hours later prior to 8:00 a.m.
Between 2:00 a.m. and 3:00 a.m., also on February 17, Vasquez and his companion checked into the Jay Motel in Baton Rouge, located next to the Salvation Army halfway house where Barry Seal was serving his probation sentence. Photographs were introduced at trial which showed that Vasquez's room at the Jay Motel had a direct view of the Salvation Army parking lot where Barry Seal arrived and departed daily.
Vasquez returned to New Orleans later in the day, on February 17, and purchased a Buick Park Avenue automobile from Herman Cardenas at Toyota of Jefferson. He paid $6,500.00 cash for the car and purchased it in the name of his girlfriend, Mary Cook. Peter Ashooh, an FBI agent, ran checks on all of the information which Vasquez provided on Mary Cook, e.g., driver's license, social security number, address, and determined that none of the information was connected to anyone named Mary Cook.
Vasquez picked up the Buick from Toyota of Jefferson on the following day, accompanied by a heavy set, dark complexioned Hispanic male. Vasquez left in the rented Lincoln which he drove to the dealership while the Hispanic male took the Buick. The description of the person who was with Vasquez that day matches that of Jose Renteria Campo, who had checked *123 into the New Orleans Airport Hilton earlier on February 18.[2]
On February 18 and 19, Vasquez went to Anthony's Department Store in Kenner, Louisiana, and purchased a rain slicker, baseball caps, and luggage. He later returned and bought more clothing, including a plaid western shirt. Two walkie-talkie radios were purchased for $341.00 cash at Radio Shack in Esplanade Mall in Kenner. The radios were purchased under the name Jose Lopez. One was found inside the getaway vehicle on the day of the murder. The fingerprints of Bernardo Vasquez were found on the batteries inside this radio.
Dennis Debate, an East Baton Rouge Parish sheriff's deputy, testified that on February 19, at approximately 5:45 p.m., he observed a late model Buick parked in the middle of the road adjacent to the Belmont Hotel, near the Salvation Army halfway house. An individual sat in the car wearing a red or orange baseball cap and a T-shirt, smoking a cigarette.
Shortly thereafter, at approximately 6:00 p.m., Barry Seal arrived at the Salvation Army. He backed his white Cadillac into a parking space and opened the driver's door. Before he could get out of his vehicle, however, a gunman jumped from behind the donation drop boxes and fired a .45 caliber Mac-10 machine gun. Seal died of multiple gunshot wounds to the head. The gunman ran to a waiting Buick which sped away from the Salvation Army.
Several eyewitnesses to the murder testified at trial. Robert Lane observed a vehicle with two men pull into a parking space near the drop boxes at the Salvation Army. Both men got out of the car and put items into the drop boxes, including a plaid article of clothing. (A new plaid shirt with straight pins still in it was recovered from one of the drops boxes at the Salvation Army.) Lane stated that the driver was taller than the passenger and wore scrub pants. The passenger was the gunman and was a shorter individual. Lane identified the vehicle which left the Salvation Army as a Buick Park Avenue. Lane also identified defendant Velez as the person who drove the getaway vehicle. Witnesses Colleen McGehee, Mitchel Orgeron, and Benny Louis identified defendant Luis Carlos Quintero-Cruz as the gunman. Witness Alvin Ricks stated that one of the individuals had a "Dick Tracy" chin. It was brought out at trial that Velez was nicknamed "Cumbamba" because of his protruding chin.
After the shooting, the men in the Buick raced from the parking lot and drove approximately three-tenths of a mile down the service road. They abandoned the Buick with the engine still running, got into a red Cadillac, and left the scene. The Mac-10 machine gun, along with an Uzi pistol, various quantities of ammunition, clothing from Anthony's Department Store, and a walkie-talkie radio with the power running, and other items, were recovered from the Buick. East Baton Rouge sheriff's deputies Hardy and Bonnette observed the switch from the Buick to the Cadillac. Both deputies testified that the men changed vehicles in great haste. Hardy testified the driver was taller than the passenger. Bonnette testified that the passenger looked like defendant Cruz, but could make no positive identification.
Fingerprints from the three defendants were found in both the Buick and the red Cadillac, which was recovered sometime later at the New Orleans Airport Parking Garage. The Cadillac had 162 miles elapsed from the time of rental. Evidence was introduced at trial to show this was the approximate mileage of a round trip between Baton Rouge and New Orleans.
Approximately one and one-half hours after the shooting, Jose Renteria Campo *124 and Vasquez checked out of the New Orleans Airport Hilton. Velez attempted to get a flight out of New Orleans but was unable to do so. He was detained briefly at the airport by FBI agents, but released due to incomplete descriptions of the murder suspects. Velez then met Vasquez at the Hilton. Velez never checked out of the hotel, but rather, hired a taxicab to take him to Montgomery, Alabama. He paid a fare of $235.00 in cash. While en route to Alabama, Velez's taxi hit a deer near Meridian, Mississippi. He was arrested shortly thereafter, with the keys to the red Cadillac in his possession, along with cash and luggage containing scrub pants.
Meanwhile, Vasquez discussed with several witnesses the fact that he wanted to transport three illegal aliens from Colombia who had entered the country through Mexico. He told Gonzalo Jaramillo that one of them had already been stopped by immigration officials, and he pointed to an article concerning the Seal murder in the February 21, 1986 Times Picayune.
Vasquez was arrested at Gonzalo Jaramillo's residence on February 21. Prior to this he had been placed under surveillance by the FBI, based on a tip by Jaramillo. Agents observed Vasquez abandon the Lincoln Town Car in the parking lot of a New Orleans business called Gator Graphics. He was also observed placing a number of objects into a trash bin. Found in the trash bin by the FBI agents were the keys to the rented Lincoln, a pair of black knit gloves, a map from Avis Car Rental, a rental agreement in the name of Bernardo Vasquez which had been torn in half, and a baseball cap. After abandoning these items, Vasquez took a taxi to the general area of Jaramillo's home and walked to the residence. He left a short time later and went to a residence on Glasco Street where Cruz and Cardona Garcia had previously gone. He returned to Jaramillo's home where he was arrested a short time later.
Alberto Villada-Zapata testified that he picked up defendant Cruz and Cardona Garcia at Vasquez's request and transported them to 5825 Glasco Street. Cruz was later arrested at this residence in possession of over $3,000 cash, plus Mexican and British currency. Garcia was also arrested and found to be in possession of $2,000 cash.
All three defendants were found guilty of first degree murder based on the aforementioned testimony and evidence. They now appeal their convictions to this court.

Issue #1

BATSON CHALLENGE
By this assignment of error, defendants contend the trial judge improperly permitted race based exclusions of jurors effected through peremptory challenges, even though the defendants and the excluded jurors did not share the same race.
Defendants are members of the Hispanic race. Throughout the jury selection process, defendants objected when the prosecutor exercised peremptory challenges to remove black venirepersons. Defendants urged their objections pursuant to the United States Supreme Court decision in Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986) and La.C.Cr.P. art. 795 which prohibit the exercise of a peremptory challenge based solely on race.
The trial judge overruled the objections based on the Batson requirement that the defendant be a member of the same cognizable racial group as the excused juror. At the time of trial, there was sparse, if any, jurisprudence interpreting Article 795, and the trial judge declined to construe the article as any more broad than the Batson decision. Essentially, the trial court held the defendants did not have standing to object to the State's peremptory challenges of certain black venirepersons. Therefore, the trial judge did not determine whether defendants had made a prima facie showing of purposeful discrimination, and the State was not required to present neutral explanations for the disputed challenges.
Since the trial of this matter, the United States Supreme Court has expanded Batson to allow a criminal defendant to object to race based exclusions of jurors effected through peremptory challenges even if the defendant and the excluded juror do not share the same race. Powers *125 v. Ohio, ___ U.S. ___, 111 S.Ct. 1364, 113 L.Ed.2d 411 (1991). (Batson has likewise been extended to civil litigants. See Edmonson v. Leesville Concrete Co., Inc., ___ U.S. ___, 111 S.Ct. 2077, 114 L.Ed.2d 660 (1991.))
Because Batson itself was applied retroactively as a constitutional rule of criminal procedure, see Griffith v. Kentucky, 479 U.S. 314, 107 S.Ct. 708, 93 L.Ed.2d 649 (1987), any extension of Batson must likewise be given retroactive effect. See also State v. Thompson, 516 So.2d 349 (La. 1987), cert. denied, 488 U.S. 871, 109 S.Ct. 180, 102 L.Ed.2d 149 (1988). Therefore, we must consider the facts of this case in light of the Powers decision.
The Powers case involved a white defendant who objected to the exclusion of black jurors. The court considered the specific question of whether such a defendant has standing to raise the equal protection rights of a juror improperly excluded from service. The court focused on the juror as the aggrieved party and discussed the criteria which must be evident before a litigant (in this case the criminal defendant), will be allowed to assert the rights of a third party (here, the juror):
[T]he litigant must have suffered an "injury-in-fact," thus giving him or her a "sufficiently concrete interest" in the outcome of the issue in dispute, Singleton [v. Wulff, 428 U.S. 106, 112, 96 S.Ct. 2868, 2873, 49 L.Ed.2d 826 (1976) ]; the litigant must have a close relation to the third party, id., at 113-114, 96 S.Ct., at 2873-2874; and there must exist some hindrance to the third party's ability to protect his or her own interests. Id., at 115-116, 96 S.Ct., at 2874-2875. See also Craig v. Boren, 429 U.S. 190, 97 S.Ct. 451, 50 L.Ed.2d 397 (1976).
111 S.Ct. at 1370-1371.
The Powers court determined that the discriminatory use of peremptory challenges causes a criminal defendant cognizable injury because such a practice jeopardizes the integrity and fairness of the judicial process. The defendant and the prospective juror have a close relation for purposes of the trial because the defendant seeks to establish a bond of trust with the juror from the initiation of voir dire through the sentencing phase of the trial. Finally, the Powers court noted that an excluded juror has little incentive to bring an action on his own behalf, and because of the defendant's similar interest in eliminating racial discrimination from the courtroom, the defendant would be a proper party to assert the juror's rights.
Because the Powers prosecutor had previously agreed to a remand in the event the standing issue would be resolved in the defendant's favor, the Supreme Court, through Justice Kennedy, made only the following brief comments on the question of what constitutes a prima facie showing of purposeful discrimination:
The emphasis in Batson on racial identity between the defendant and the excused prospective juror is not inconsistent with our holding today that race is irrelevant to a defendant's standing to object to the discriminatory use of peremptory challenges. Racial identity between the defendant and the excused person might in some cases be the explanation for the prosecution's adoption of the forbidden stereotype, and if the alleged race bias takes this form, it may provide one of the easier cases to establish both a prima facie case and a conclusive showing that wrongful discrimination has occurred. But to say that the race of the defendant may be relevant to discerning bias in some cases does not mean that it will be a factor in others, for race prejudice stems from various causes and may manifest itself in different forms.
It remains for the trial courts to develop rules, without unnecessary disruption of the jury selection process, to permit legitimate and well-founded objections to the use of peremptory challenges as a mask for race prejudice.
111 S.Ct. at 1373-1374.
According to this language, the existence of a racial identity between the defendant and the excluded juror is irrelevant to the defendant's standing to object to a peremptory challenge based on race. Rather, it is *126 only one factor to be considered in determining whether the defendant has made a prima facie showing of discrimination. The Batson requirement that other relevant circumstances must be considered is still viable, and racial identity is only one of those circumstances. The defendant must always make a prima facie showing of discrimination before the prosecutor will be required to present neutral explanations for his peremptory challenges.
In the case before us, the trial judge overruled defendants' objections to some of the prosecutor's peremptory challenges on the basis that the defendants did not have standing to so object. Had the trial judge not based his decision on standing, but rather on the lack of a prima facie showing of discrimination, we hold, based on our review of the voir dire transcript, that the result would have been the same. We find, therefore, that the trial judge properly overruled the defendants' objections, not because of a lack of standing, but because of the absence of a prima facie showing of discrimination.
The record before us reveals the following circumstances. Over 300 venirepersons were interviewed during voir dire. The prosecutor was given 36 peremptory challenges and exercised 21 challenges on whites and 15 challenges on blacks.[3] The prosecutor asked similar questions of black and white prospective jurors and spent generally as much time questioning blacks as whites. Approximately eight blacks were excused because of reservations concerning the death penalty, just as numerous whites were excused for the same reason. One black female was seated on the jury and the prosecutor accepted a black who was excluded by defense counsel, both of which occurred before the State exhausted its peremptory challenges.
The defendants had no racial identity with the challenged jurors, although it is true they were all members of minority groups. The defendants were charged with first degree murder which requires a unanimous verdict, discounting an inference that the prosecutor may have allowed a minimum number of blacks on the jury because their votes may not ultimately count, such as in a noncapital case which requires the concurrence of only ten jurors for a guilty verdict.[4] Finally, we note the record reflects no pattern of strikes against blacks and no systematic exclusion of blacks from this jury. What we detect from the voir dire transcript is the prosecutor's preoccupation with seating jurors open to, and comfortable with, the death penalty, a characteristic she would have understandably desired for all jury members.
Our holding today is consistent with recent Louisiana jurisprudence interpreting Batson and its progeny. In State v. Thompson, supra, the Supreme Court applied Batson retroactively, reviewed the circumstances of voir dire, and concluded the defendant failed to establish a prima facie case of purposeful discrimination. In spite of the fact that the prosecutor exercised all of his peremptory challenges against blacks, the final jury consisted of four blacks and the State accepted three others who were excused by the defense. These seven blacks were accepted by the State before the prosecutor had exhausted all of his challenges. Additionally, the court found nothing in the prosecutor's questions during voir dire which would support an inference of a discriminatory purpose. In State v. Collier, 553 So.2d 815 (La.1989), the Supreme Court reversed and remanded for a new trial a case in which the prosecutor exercised eight peremptory challenges, and all challenged venirepersons were black, as was the defendant. *127 The final jury composition was ten whites and two blacks, and the defendant was charged with a noncapital offense which requires the concurrence of only ten jurors. The trial court and the Supreme Court found these facts constituted a prima facie showing of discrimination; the trial judge was thereafter satisfied by the prosecutor's racially neutral explanation for each challenge, but the Supreme Court disagreed with that finding and remanded for a new trial.
In State v. Potter, 578 So.2d 528 (La. App. 4th Cir.1991), the Fourth Circuit remanded for a Batson hearing after it determined that a prima facie showing of discrimination had been made because the prosecutor exercised 11 challenges, all against blacks, in the trial of a black criminal defendant. Conversely, in State v. Cannon, 572 So.2d 740 (La.App. 4th Cir. 1990), writ denied, 575 So.2d 821 (La.1991), the court affirmed the trial court's denial of the defendant's Batson objection after noting the 50-person venire was comprised of 37 blacks. The court pointed out, "Because of the overwhelming number of blacks on the venire, most of those being challenged had to be black and possibly all those presented as prospective jurors were black." 572 So.2d at 742. The court held that no prima facie showing of purposeful discrimination was made in that case.
In State v. Royal, 527 So.2d 1083 (La. App. 1st Cir.1988), writ denied, 533 So.2d 15 (La.1988), the denial of defendant's Batson challenge was affirmed, and the court concluded that the State had legitimate reasons unrelated to race for excusing certain black potential jurors. Additionally, the court noted the relevant statistical circumstances: the defendant was black, three black jurors were seated, the first juror seated was black, and the prosecutor exercised five peremptory challenges to exclude white venirepersons. Similarly, in State v. Simms, 505 So.2d 981 (La.App. 3d Cir. 1987), this court affirmed the denial of a Batson challenge by a black defendant, and noted the defendant had not met his burden of showing purposeful discrimination since one of the three jurors selected at the time of his Batson objection was a member of the black race.
The facts presented in this case do not establish a prima facie case of purposeful discrimination. We conclude, as did the Thompson court, the State did not exercise its peremptory challenges with a discriminatory purpose. Neither the voir dire transcript nor the numerical evidence concerning the prosecutor's challenges support such an inference; accordingly, the State was under no obligation to present racially neutral reasons for each peremptory challenge of a black venireperson. While it is true the trial judge incorrectly determined that defendants did not have standing to object under Batson, the trial judge ultimately did not err in denying defendants' motion for mistrial based on the State's exercise of its peremptory challenges against blacks because no prima facie showing of purposeful discrimination was made.

Issue #2

OTHER CRIMES EVIDENCE
Defendants next contend the trial judge erred in allowing into evidence certain testimony concerning the illegal activities of the Medellin Cartel and testimony regarding the defendants' illegal possession of firearms. Specifically, defendants argue that much of the testimony of Mermelstein and Uribe-Munera was irrelevant, prejudicial, and inflammatory and constituted grounds for a mistrial. The evidence did not pertain to any of the defendants, yet prejudiced them to the extent that Velez was implicated as a member of the Cartel, and Vasquez and Cruz were joined to Velez as codefendants in the same trial. The firearms evidence did allegedly pertain to the defendants, but, they contend, it constitutes inadmissible other crimes evidence.
At the outset, we can dispose of the issue concerning the firearms evidence with minimal discussion. According to La. C.E. art. 404 B(1), evidence of other crimes, wrongs, or acts is admissible when "it relates to conduct that constitutes an integral part of the act or transaction that is the subject of the present proceeding." This is the codification of the res gestae provision *128 formerly enacted at La.R.S. 15:447-448. Evidence admissible under the res gestae exception to the general inadmissibility of other crimes evidence is not subject to any notice requirements. State v. Prieur, 277 So.2d 126 (La.1973).
The testimony of Robert Barns from the Bureau of Alcohol, Tobacco, and Firearms revealed that the Mac-10 machine gun found in the getaway car was illegal because it contained no serial number and was not registered with the United States government. This gun was used in the murder of Barry Seal, and evidence of the defendants' possession of it is an integral part of the crime at issue herein. The Uzi identified by Jose Countin was likewise found in the getaway car and is therefore governed by the same rule.
The evidence relating to the Medellin Cartel and its various criminal activities is more problematic, but we find the trial judge did not err in failing to exclude it. The record shows that Mermelstein was associated with the Medellin Cartel and was responsible for the importation of 111,000 pounds of cocaine into the United States. The focus of Mermelstein's testimony was the formation of the initial contract to kill Barry Seal. However, in the course of explaining how the contract came to be, Mermelstein discussed the inner workings of the Cartel and the benefits of being a Cartel member; he also briefly outlined the cocaine exportation and distribution process and offered unsolicited testimony on crimes he had witnessed.
Uribe-Munera testified that he agreed to go to the United States and kill someone pursuant to a request by a Cartel representative. When he later backed out of the agreement, he was shot five times. This testimony was offered to show Uribe-Munera's involvement in the conspiracy to kill Barry Seal. However, in the course of explaining that involvement, Uribe-Munera testified to a virtual plethora of criminal activity associated with the Cartel. He described his participation in numerous murders in Colombia which included the killing of a judge, a doctor, and a mayor, and he discussed his involvement with well-known Colombians such as Carlos Lehder and the Ochoa family. He spoke of drug smuggling, kidnapping, illegal weapons possession, and forged travel documents. The challenged testimony of Mermelstein and Uribe-Munera was not connected to any defendant.
The State contends that all of the challenged evidence was relevant to prove the offeror's motive in this murder-for-hire case. The Cartel, as the offeror, wanted Barry Seal silenced because he was privy to the criminal activities of the Cartel as described by Mermelstein and Uribe-Munera. The State also argued at trial that much of the challenged evidence was Giglio material, i.e., evidence relating to the credibility of prosecution witnesses, and should therefore be admissible. See Giglio v. United States, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972).
The Louisiana Supreme Court discussed the evidentiary requirement of relevancy in State v. Franklin, 353 So.2d 1315 (La. 1977). In balancing the relevance or probative value of certain evidence, as defined by La.R.S. 15:441 (now codified at La.C.E. art. 401), with its potential for undue prejudice, a court must consider several factors: the danger that the evidence may unduly arouse the jury's emotions of prejudice, hostility, or sympathy; the probability that the evidence may create a collateral issue which will unduly distract the jury from the main issue; delay in the trial; and the danger of unfair surprise. 353 So.2d at 1322. The Franklin case involved evidence concerning the foreign source of heroin and how it is distributed in the United States. The court found the evidence was relevant and "the danger was slight that the jury could have drawn the prejudicial inference that Franklin himself had smuggled the heroin." 353 So.2d at 1323.
Similarly, in the case before us, we do not believe the testimony of Mermelstein or Uribe-Munera, which focused on the culpability of the Cartel as the offeror in this murder-for-hire case unduly prejudiced the jury against the defendants tried herein. Any hostility the jurors may have felt would have been directed against the Cartel *129 as a group. Testimony concerning the existence and practices of the Cartel did not create a collateral issue; rather, the Cartel was described as an integral part of this contract killing. Finally, the testimony neither delayed the trial nor surprised the defendants, and the jury was not given the impression that the atrocities of the Cartel were committed by the defendants themselves.
Considering in particular the testimony of Max Mermelstein, we find his testimony was useful to the jury in several respects. It provided the motive for the contractual murder of Barry Seal under the State's theory of the case. Evidence of motive is relevant even though motive is not an element of the crime of first degree murder. Mermelstein's testimony set the stage for his own involvement in the initial Seal murder contract and explained how he came to be involved in the contract. It also explained why he is now a member of the federal witness protection program. Finally, the testimony served to describe and identify the Cartel and its leaders as a party to the murder-for-hire contract on Seal's life. The trial judge was careful to admonish the jury to disregard certain inadmissible comments offered by Mermelstein, and he cautioned the prosecutor several times that he would not let the testimony go too far.
Likewise, to the extent the testimony of Uribe-Munera may be considered prejudicial, it was relevant and admissible nonetheless. His testimony was offered primarily to show the existence of the murder-for-hire contract. His testimony supported the proposition that the Cartel was a party capable of, and interested in, putting out a contract on Seal's life. Furthermore, the strong cross examination of Uribe-Munera gave the jury a balanced perspective of the witness and his testimony.
While it is true the prosecutor offered the testimony in part to bolster the credibility of her witnesses, and to that extent constitutes Giglio material, we do not believe the provision of Louisiana law which prohibits the bolstering of a witness's credibility until after his credibility has been attacked has been violated. See La.C.E. art. 607(B). In addition to credibility, the evidence provided background information on these witnesses and the background for this murder, a relevant set of circumstances in almost any homicide prosecution. The trial judge did not err in failing to exclude the challenged testimony or in failing to grant a mistrial once the testimony had come into evidence.

Issue #3

BRADY MATERIAL
The next issue raised by the defendants is the trial court's failure to require production by the State of certain evidence concerning two of the State's witnesses. Defendants sought production of the medical records of Uribe-Munera, certain inconsistent statements given by Uribe-Munera upon his arrest in the United States, and more extensive information concerning the plea bargains between any federal or state government entity and the State's witnesses, Uribe-Munera and Mermelstein. Defendants contend these witnesses were the only sources of proof regarding the contract to murder Barry Seal; therefore, a thorough assessment of their credibility with the benefit of the requested information was critical for purposes of impeachment on cross-examination.
The constitutional guarantee of due process requires the State, upon request, to produce evidence favorable to an accused when the evidence is material to either guilt or punishment. Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). Evidence favorable to a defendant includes both exculpatory and impeachment evidence. United States v. Bagley, 473 U.S. 667, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985). Evidence is material only if there is a reasonable probability that had the evidence been disclosed to the defense the result would have been different. Giglio, supra. A reasonable probability is a probability sufficient to undermine confidence in the outcome. State v. Rosiere, 488 So.2d 965 (La.1986).
Under Louisiana law, the prosecution is not required to provide unlimited discovery. *130 La.C.Cr.P. art. 723. However, the State must comply with the requirements of Brady and its progeny, and the provisions of the Code of Criminal Procedure pertaining to discovery in criminal cases. La.C.Cr.P. art. 716 et seq.
La.C.Cr.P. art. 729.3 imposes on the State a continuing duty to disclose discoverable evidence, but a defendant's conviction may be reversed only if the State's noncompliance with discovery prejudiced the defendant. State v. Johnson, 544 So.2d 767 (La.App. 3d Cir.1989). Louisiana law further provides that the right to confrontation does not include a blanket right to pretrial disclosure of any and all information that might, by any stretch of the imagination, be useful in contradicting unfavorable testimony. State v. Davis, 562 So.2d 1173, at 1176 (La.App. 4th Cir.1990).
Concerning the specific evidence sought by the defendants, the State contends that it did not have possession, custody, or control of any of the requested information. The "long medical history" of Uribe-Munera is referred to in a brief medical summary which the State asserts was prepared by the United States Department of Justice. The Department of Justice never gave the complete medical history to the State and it was therefore never passed along to the defendants. Similarly, the prosecutor informed the trial judge that she was not in possession of the transcripts of certain FBI interrogations of Uribe-Munera. She had only summaries of Uribe-Munera's three statements which were given to defendants upon request for discovery of Giglio material.
We know of no duty or obligation which would require the State to obtain such information for the defendants' discovery purposes. For instance, Louisiana law clearly holds that the State has no duty to obtain rap sheets on its witnesses. See State v. Harvey, 358 So.2d 1224 (La.1978); State v. Seifert, 524 So.2d 160 (La.App. 4th Cir. 1988); and State v. Vampran, 491 So.2d 1356 (La.App. 1st Cir.1986), writ denied, 496 So.2d 347 (La.1986). Nor do we see how the requested information is material to the question of defendants' guilt in this case. Uribe-Munera's testimony concerned the existence of a contract on Barry Seal's life and the culpability of the Medellin Cartel and its leaders as parties to that contract. The credibility of his testimony does not directly affect the determination of guilt of the defendants tried herein.
Our analysis is similar concerning the plea bargain information sought by the defendants. They wanted more complete information on the crimes of Mermelstein and Uribe-Munera for which they have been granted immunity or leniency. The prosecutor insisted she had no more information than that which was already provided.
The trial court herein determined that the prosecutor provided all of the information in her possession in good faith. As in Seifert, the trial court found the State's response to be "good and sufficient." 524 So.2d at 164. Accordingly, we find no error in the trial court's decision on these discovery matters. Nor do we find the defendants were prejudiced by the absence of the requested material.

Issue #4

POST ARREST STATEMENTS
The next issue we will address is assigned as error solely by defendant Vasquez. He contends the trial court erred in permitting the introduction of post arrest inculpatory statements obtained in violation of constitutional guarantees. He further complains of a comment made at trial by a witness for the State concerning his invocation of the right to remain silent.
We note initially that Vasquez did not timely file a motion to suppress inculpatory statements before or during the trial. This would ordinarily operate as a waiver of any alleged constitutional infirmities. State v. Rios, 528 So.2d 163 (La.App. 3d Cir.1988), writ denied, 530 So.2d 83 (La. 1988). However, defendant contends the failure of his attorney to file the proper motions constitutes ineffective assistance of counsel, thus entitling him to a new trial. A claim of ineffective assistance of counsel is more properly raised in a petition for post conviction relief; where, however, *131 the record contains evidence necessary to decide the issue and the alleged ineffectiveness is raised on appeal by an assignment of error, the court should consider the claim. State v. Heacox, 543 So.2d 101 (La. App. 3d Cir.1989). We will therefore address Vasquez's contentions relating to his post arrest statements in an ineffective assistance of counsel context.
The Sixth and Fourteenth Amendments guarantee the defendant in a state criminal proceeding assistance of counsel for his defense. The United States Supreme Court has held that the right to counsel is the right to the effective assistance of counsel. McMann v. Richardson, 397 U.S. 759, at 771, 90 S.Ct. 1441 at 1449, 25 L.Ed.2d 763 (1970). In outlining the convicted defendant's burden of proof in an ineffective assistance case, the Supreme Court has established a two-part test. The defendant must show that a deficient performance on the part of his attorney prejudiced his defense. Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).
The first prong of the test examines whether the attorney violated some duty to the client. The second prong of the test requires a showing of prejudice, resulting from defense counsel's deficient performance, without which the result of the proceedings would have been different. The defendant must show there is a reasonable probability that, but for his counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome of the trial. Strickland, 466 U.S. at 694, 104 S.Ct. at 2068.
We need not address whether counsel for Vasquez was deficient in the performance of his duties in this case because we find the failure to file the appropriate suppression motions did not prejudice Vasquez to the degree required by Strickland for a successful ineffective assistance claim. Before a confession or inculpatory statement can be introduced into evidence, the State has the burden of affirmatively proving that the statement was free and voluntary and not made under the influence of fear, duress, intimidation, menaces, threats, inducements, or promises. La.R.S. 15:451. In the instant case, the record reflects that on each occasion in which Vasquez was interviewed by law enforcement officials, he was advised of his Miranda rights, both orally and in writing. There is no evidence that Vasquez was under the influence of coercion, duress, threats, or promises. Before each interview commenced, he signed a waiver of rights form. Michael Thompson, an investigator with the East Baton Rouge Parish District Attorney's Office, testified that when Vasquez was interviewed, he showed an ability to speak and understand the English language and conversed very well with law enforcement officials. There is nothing to indicate Vasquez did not understand his rights or the fact that he was waiving those rights by talking to the investigators.
Vasquez argues additionally that the post arrest statements should be suppressed because they were made subsequent to his invoking the right to counsel in violation of the rule articulated by the Supreme Court in Edwards v. Arizona, 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981). The State responded in oral argument that the post arrest statements were initiated by Vasquez, giving rise to the one exception to the Edwards rule of suppression. The record contains no evidence on either side of this issue. We have nothing properly before us from which we can resolve this factual dispute.
The State proved the free and voluntary nature of the post arrest statements made by Vasquez. Therefore, any alleged deficiency in the performance of Vasquez's attorney stemming from his failure to file a motion to suppress did not result in prejudice sufficient to render that performance ineffective under Strickland. The trial judge did not err in permitting introduction of these post arrest inculpatory statements.
Vasquez next contends the trial court erred in failing to grant a mistrial or, at the very least, to give a curative instruction to the jury after FBI special agent Jorge Fernandez commented on his invoking *132 the post arrest right to remain silent. The comment appears in the record as follows:
A. Towards the end of the interview being conducted by agent Presutti at which time Vasquez he [sic] indicated he didn't want to answer any further questions and Iand he then said he didn't understand English very well.
MR. WALKER:
Your Honor, objection. Can we approach the bench?
THE COURT:
Okay.
MR. WALKER:
I would make an objection at this time, Your Honor, and move for mistrial based upon the fact that this witness has indicated that my client has exercised his constitutional Fifth Amendment right.
Defendant Vasquez contends that the denial of a mistrial in this instance constitutes reversible error. We disagree.
This issue has been dealt with numerous times in Louisiana jurisprudence. In State v. Smith, 336 So.2d 867 (La.1976), a police officer who had interviewed the defendant testified that the defendant refused to give a statement to the officers. The defendant moved for mistrial but the trial court denied the motion, failed to give a cautionary instruction (though one would have been proper), and allowed the trial to continue. The Louisiana Supreme Court affirmed the trial court's ruling:
After the objection was overruled, no other evidence or comment of the prosecutor in the record refers to the defendant's pre-trial silence. The trial as a whole was fairly conducted, the proof of guilt is strong, and the State made no use for impeachment of the defendant's custodial silence.
We are therefore unwilling to hold that a mistrial is required because of the incidental and almost inadvertent (although improper) reference to the accused's custodial silence in two lines of a 101-page trial transcript, especially in the absence of any indication of the deliberate intent of the State to inject or exploit the issue (and also considering the uncertainty, until this opinion, of the Louisiana jurisprudence as to this precise issue).
Although the issue is close, we thus for the reasons stated find no abuse of the trial court's discretion in its denial of a mistrial.
336 So.2d at 869-870.
In State v. Kersey, 406 So.2d 555 (La. 1981), an officer who interviewed the defendant stated at trial that after giving a detailed statement, the defendant asserted his right to remain silent. The Louisiana Supreme Court found this did not constitute reversible error:
In this case, however, the reference to defendant's post-arrest silence does not appear to be for the purpose of simply calling the jury's attention to it or having the jury make an inappropriate inference. When the objected to questioning is read in context with the rest of that officer's testimony, it is clear that the reference was made in an attempt to show that the entire statement made to the officers had been provided to the jury. According to the witness police officer, defendant was advised of his Miranda rights and then willingly answered a succession of questions. He made some statements that were exculpatory and some that were inculpatory in effect. The reference to defendant's post-arrest silence arose at the close of the officer's testimony and was more a way of exploring how the interrogation was concluded than an effort to call attention to the silence.
406 So.2d at 559.
In the case before us, Vasquez talked at length with officers concerning the Seal investigation before stating that he wished to stop the interview. The reference to the assertion by defendant Vasquez of his right to remain silent was followed immediately by the comment that he did not understand English thoroughly. This explanation or rationale provided a context within which Vasquez invoked his right to remain silent. The implication to the jury was that Vasquez found himself lost in the English conversation, not that he had anything to hide. While the trial judge certainly *133 could have given a cautionary instruction in this instance, we do not believe the failure to do so, or the failure to grant a mistrial, was reversible error under these circumstances.

Issue #5

GUNSHOT RESIDUE TEST
The next assignment of error is raised solely by defendant Velez. He contends the trial court erred in denying his motion to suppress the results of a gunshot residue test which was performed upon him 13 hours after Barry Seal was murdered. The record in the instant case shows that after Velez was arrested, a neutron activation or gunshot residue test was performed during which Velez's hands were swabbed and tested for levels of antimony and barium. Velez registered high levels of barium, but extremely low antimony levels. Jim Churchman, a forensic scientist with the Louisiana State Police Crime Lab, explained that these tests are normally not conducted more than six hours after the firearm was allegedly handled or discharged due to dissipation of the particles on the person's hands which would make a positive test result unlikely even if the person had in fact handled or discharged a firearm.
Churchman stated that although the high barium levels on Velez's hands were suggestive evidence that he had handled or fired a weapon, he was unable to conclusively so state. Velez contends the results of the neutron activation test were highly unreliable and created prejudice sufficient to require a reversal.
Our Supreme Court has noted that scientific tests and expert opinions based thereon are admissible if the scientific principle is generally considered reliable and accurate by the scientific community. State v. Boyer, 406 So.2d 143 (La.1981). The Boyer court pointed out that neutron activation tests are the subject of widespread acceptance, but cautioned that a test is no more reliable than the person who conducts it.
The test in the instant case was conducted by Jim Churchman, who has conducted in excess of 500 neutron activation tests in his experience as a forensic scientist. He received training from the manufacturer of the test kits and from the Alcohol, Tobacco and Firearms Laboratory in Atlanta, Georgia. The record reflects Churchman was competent to conduct the test at issue herein.
Evidence which "tends to show the commission of the offense and the intent, or tends to negate the commission of the offense and the intent" is relevant. See formerly, La.R.S. 15:441 and the current rule now codified at La.C.E. art. 401 which states, "`Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Any evidence, whether direct or circumstantial, is relevant if it tends to prove or disprove the existence of a material fact. State v. Williams, 486 So.2d 889 (La.App. 1st Cir. 1986), writ denied, 489 So.2d 915 (La.1986).
The neutron activation test performed upon defendant Velez was inconclusive, but was nonetheless relevant and properly introduced at trial. An individual piece of evidence need not constitute proof positive of the material issue to be relevant and admissible. The evidence must simply have a tendency to make a consequential fact more or less probable. State v. Ludwig, 423 So.2d 1073 (La.1982).
The test in question suggested that Velez had recently handled a weapon. This evidence was not conclusive, however, and Velez's attorney was able to point out a number of factors attacking the significance of the test results. The jury was properly allowed the opportunity to weigh this evidence and evaluate its significance as they saw fit. Accordingly, we find no error in the trial court's denial of Velez's motion to suppress the results of the gunshot residue test.

Issue #6

IDENTIFICATIONS
Defendant Cruz assigns as error the trial court's refusal to allow the testimony of Dr. Gary Wells, a proffered expert on eyewitness identification. He also contends *134 the trial court erred in refusing to hold an evidentiary hearing on the reliability and admissibility of the identification testimony of Benny Louis. Similarly, defendant Velez contends the trial court erred in allowing introduction of an identification by eyewitness Robert Lane.
The issue of expert testimony pertaining to eyewitness identification has previously been addressed by the Louisiana Supreme Court in State v. Stucke, 419 So.2d 939 (La.1982). That case contains a thorough review of jurisprudence concerning the acceptance or rejection of expert testimony in the area of eyewitness identification. The court cited cases from various state courts in which such expert testimony was offered and rejected at trial. The Stucke court affirmed the refusal of the trial court to allow testimony regarding eyewitness identification, and concluded:
[T]he prejudicial effect of such testimony outweighs its probative value because of the substantial risk that the potential persuasive appearance of the expert witness will have a greater influence on the jury than the other evidence presented during the trial. Such testimony invades the province of the jury and usurps its function.
419 So.2d at 945. The holding of the Louisiana Supreme Court in Stucke represents the current state of the law on this issue in Louisiana. We decline to deviate from that rule.
Concerning the surprise identification of defendant Cruz at trial, the record reflects that Benny Louis testified concerning his memory of the shooting. He indicated that he was uncertain of his ability to identify anyone. Louis then concluded his testimony and left the courtroom. A short time later, after Louis met with a State investigator, he returned to the stand and identified Cruz as the shooter in the murder of Barry Seal. Counsel for both the defense and the prosecution were surprised by the identification.
The trial court granted defense counsel's request for a recess and excused the jury from the courtroom. At the conclusion of the recess, defense counsel questioned Louis extensively concerning factors which could affect the reliability of his identification of Cruz.
The purpose of discovery rules in criminal trials is to eliminate unwarranted prejudice from surprise trial testimony. State v. Toomer, 395 So.2d 1320 (La.1981). However, these rules will not allow a defendant to exclude testimony solely because it comes as a surprise to him. Although La. C.Cr.P. art. 729.3 imposes a continuing duty upon the prosecution to disclose additional evidence to the defense when it discovers same, the State is under no duty to disclose information which it does not possess. State v. Williams, 448 So.2d 659 (La.1984). Therefore, exclusion of evidence is a sanction which is not available when the State has uncovered evidence at an inopportune time for the defense. Williams. Because the prosecutor did not learn of Louis' ability to identify Cruz until after Louis was recalled to the stand, the State did not have possession of this information in sufficient time to disclose it to defense counsel. Therefore, the trial court did not err in refusing to exclude this testimony based on surprise.
Cruz next contends the identification was tainted by contamination from pretrial publicity and a discussion with a State investigator. A defendant who seeks to suppress an identification must prove that the identification was suggestive and that there was a likelihood of misidentification in the identification procedure. State v. Lowenfield, 495 So.2d 1245 (La.1985), cert. denied, 476 U.S. 1153, 106 S.Ct. 2259, 90 L.Ed.2d 704 (1986); State v. Prudholm, 446 So.2d 729 (La.1984). Defendant did not prove the identification was suggestive, nor did he establish a likelihood of misidentification in this instance. His cross examination of Louis was extensive and thorough, and the particulars concerning reliability brought out at that time must go to the weight, rather than the admissibility, of Louis's in-court identification.
Cruz also argues the trial court erred in failing to conduct an evidentiary hearing on the admissibility of Louis' identification. However, the record does not indicate that *135 Cruz requested such a hearing at trial. An irregularity or error cannot be availed of after verdict unless it was objected to at the time of occurrence. La.C.Cr.P. art. 841. Since defense counsel never requested an evidentiary hearing, any alleged error in this regard cannot be asserted on appeal.
We now consider Velez's argument concerning the identification by Robert Lane. Velez contends that because Lane was shown a passport photograph of Velez prior to his viewing a lineup, the identification at the lineup was unduly suggestive. In accordance with the rule of Lowenfield and Prudholm, Velez argues the identification was suggestive and resulted in a likelihood of misidentification. The facts suggest otherwise. Lane testified that he observed the individuals at the murder scene for seven to ten minutes. He further described the driver as tall and wearing scrub pants, consistent with an accurate description of Velez. In addition, Lane made an in-court identification of Velez independent of the lineup. Considering these facts, the suggestive nature of Lane's identification goes to the weight, rather than the admissibility of the identification. Further, we find no proof of a likelihood of misidentification.
Accordingly, we find no error in the trial court's refusal to exclude or suppress the identifications by Robert Lane and Benny Louis. Nor did the trial court err in disallowing the expert testimony of Dr. Gary Wells.

Issue #7

JURY CHARGE OBJECTION
Defendants Vasquez and Cruz allege the trial court erred in not providing a transcript of the jury charge conference at which the defense unsuccessfully argued entitlement to a special instruction on identification by an eyewitness. The charge conference is not contained in the record on appeal. Because of this omission, defendants contend they cannot present their argument as to why they were entitled to this special jury instruction. From the arguments of counsel and the record before us, we are unable to discern whether the charge conference was recorded and simply not transcribed, or whether it was not recorded at all.
Defendants have the burden of making a contemporaneous objection concerning any portion of the record which may not have been transcribed and lodged with the appellate court. Since defendants did not timely object, they cannot complain of the trial court's failure to provide a transcript of the jury charge conference.
If, on the other hand, the charge conference was not recorded, we must look to the requirements of La.C.Cr.P. art. 843 which provides:
In felony cases ..., the clerk or court stenographer shall record all of the proceedings, including the examination of prospective jurors, the testimony of witnesses, statements, rulings, orders, and charges by the court, and objections, questions, statements, and arguments of counsel.
Although Article 843 does require a full recording of every felony trial, our jurisprudence has held that an inconsequential omission from a record which is immaterial to a proper determination of the appeal does not require reversal of a conviction. State v. Johnson, 438 So.2d 1091 (La.1983); State v. Richardson, 529 So.2d 1301 (La. App. 3d Cir.1988), writ denied, 538 So.2d 587 (La.1989). The inconsequential omission in Johnson was counsel's argument on the introduction of a hearsay statement, while in Richardson, the omission included the arguments of all counsel and the trial judge's reasons for ruling on each objection made at trial.
Similarly, in the case before us, the jury charge conference contained the arguments of counsel and the trial judge's reasons for ruling on the defendant's request for a special charge on the subject of eyewitness identification. We find the failure to record this conference is an inconsequential omission immaterial to a proper determination of the issue at hand. The defendants formally objected on the record to the absence of their requested special charge, and *136 the trial judge overruled their objection, with reasons, on the record.
We now consider defendants' related assignment of error, that the trial court erred in denying their request for a special jury instruction regarding factors that the jury must consider when evaluating the testimony of the witnesses who identified them.[5]
Defendants argue their entire defense was predicated on misidentification by the State's eyewitnesses. Defendants claim the jury knew what the issue was, but was left with no guidance to evaluate the sole defense of misidentification. The following charge was given to the jury by the trial judge:
As the sole judges of the credibility of witnesses and of the weight their testimony deserves, you should scrutinize carefully the testimony and the circumstances under which the witness has testified.
In evaluating the testimony of a witness, you may consider his or her ability and opportunity to observe and remember the matter about which he or she testified, his or her manner while testifying, any reason he or she may have for testifying in favor for or against the State or the defendant, and the extent to which the testimony is supported or contradicted by other evidence.
After the jury instructions had been given, defense counsel objected to the court's failure to give a special jury instruction regarding eyewitness testimony. The trial judge overruled defendants' objection and stated:
Let the Record reflect that the charge in the Court's opinion was adequately covered in the general charge and thus the reason for not wanting to do so is because of possible prejudice would result in the Court's pinpointing a particular area of the evidence.
La.C.Cr.P. art. 807 provides that a requested special charge shall be given by the court if it does not require qualification, limitation, or explanation, and if it is wholly correct and pertinent. It need not be given if it is included in the general charge or in another special charge to be given.
The instructions given in this case are very similar to instructions given in other cases involving the defense of misidentification. In State v. Foy, 439 So.2d 433 (La.1983), the trial judge instructed the jury that as the sole judges of the weight and credibility of witnesses, they should scrutinize the circumstances under which the witnesses testified, their manner while testifying, and their ability and opportunity to remember. Additionally, the judge told the jury to consider any reason the witnesses may have for testifying in favor of or against the State or the defendant, and the extent to which the testimony is supported or contradicted by other evidence. In finding the judge had properly instructed the jury, the court stated, "to have given the requested special charges on the identification issue would have improperly pinpointed this issue out of proportion with others in the case." Foy, 439 So.2d at 437. See also State v. Stewart, 357 So.2d 1111 (La. 1978).
Defendants cite State v. Hills, 241 La. 345, 129 So.2d 12 (1960) (on rehearing), in support of their argument that where the sole defense is misidentification, the trial court should give a special charge on the subject. However, in Hills, the matter of identification was not covered or even referred to in the general charge. The Supreme Court concluded that such a charge should be included in the main charge, as was the case herein.
Defendants also contend the general jury charge was inadequate when compared to the charge given in State v. Wiggins, 556 So.2d 622 (La.App. 5th Cir.1990). In Wiggins, the judge instructed the jury to consider how much time had passed between the crime and the first identification by the witnesses, and whether the witnesses *137 seemed certain at the time of the first identification and again when they testified in court. The appellate court found the charge satisfactorily instructed the jury on the State's burden of proving the defendant's identity, and that the defendant's requested charge was fully incorporated therein. While it is true that the charge given herein is not identical to the Wiggins charge, it was sufficient nonetheless. Unlike the Wiggins jury, the jury in the present case was instructed to consider the witnesses' reasons for testifying, manner while testifying, and whether their testimony is supported or contradicted by other evidence. Accordingly, we find no error in the jury charges given in this case, or in the trial court's failure to include defendants' requested charge on eyewitness identification testimony.

Issue #8

SEVERANCE
Defendants Vasquez and Cruz assign as error the trial court's refusal to grant them a severance from defendant Velez. Only Vasquez has briefed the issue. Vasquez contends he was entitled to a severance when the State introduced other crimes evidence through witnesses Max Mermelstein and Luis Carlos Uribe-Munera which was in no way connected to him. Vasquez further contends that a severance was required because of antagonistic defenses among the defendants and the radically different role which he allegedly played in the charged offense as opposed to codefendants Cruz and Velez.
La.C.Cr.P. art. 704 provides:
Jointly indicted defendants shall be tried jointly unless:
(1) the state elects to try them separately; or
(2) the court, on motion of the defendant, and after a contradictory hearing with the district attorney, is satisfied that justice requires a severance.
When a defendant moves to sever, the defendant carries the burden of proving that a severance is required. State v. Bradford, 367 So.2d 745 (La.1978). In State v. McGraw, 366 So.2d 1278 (La.1978), the court pointed out that persons jointly indicted are not entitled to a severance of trial as a matter of right, but rather, the grant or denial of a motion for severance lies within the discretion of the trial judge whose ruling will not be interfered with unless exercised arbitrarily or to the prejudice of the accused. McGraw, 366 So.2d at 1283. The McGraw court went on to explain that the mere allegation of antagonistic defenses is insufficient, as an accused must show actual prejudice resulting from a joint trial. Furthermore, the actual prejudice standard requires a showing that defendant would probably not have been convicted had he been accorded a separate trial.
The denial of a severance to defendant Vasquez was not error. Under the actual prejudice standard outlined in McGraw, Vasquez failed to show that he probably would not have been convicted if accorded a separate trial. The record contains substantial competent evidence of Vasquez's guilt, independent of any "guilt by association" implication which may have arguably come from the testimony of Mermelstein and Uribe-Munera. This evidence included, but was not limited to, fingerprint evidence, hotel, airline, and rental car records, inculpatory actions and statements, and certain purchases made just prior to the murder of items used in connection with the murder.
Vasquez also contends a severance was required because of antagonistic defenses among the defendants and the radically different role which he played in the alleged offense. We note first that defendants did not have antagonistic defenses within the meaning of McGraw, as none of the three intended to cast blame upon the others. Furthermore, justice does not require severance where only the extent of participation of each defendant is at issue. State v. Gaskin, 412 So.2d 1007 (La.1982); State v. Simmons, 381 So.2d 803 (La.1980), cert. denied, 449 U.S. 1036, 101 S.Ct. 612, 66 L.Ed.2d 498 (1980). As in Gaskin and Simmons, the evidence adduced herein indicates all three defendants were culpable as principals. The fact that each defendant's role in the crime may have differed *138 slightly or radically from the others is of no significance. Accordingly, we hold the denial of Vasquez's motion to sever did not constitute reversible error.

Issue #9

JURY MISCONDUCT
Velez, Vasquez, and Cruz next assign as error the trial court's denial of their motion to repoll the jury, conduct an evidentiary hearing, or grant a new trial based on an invalid verdict. Defendants contend that a note sent to the judge by two jurors, after the guilt phase of the trial and during the penalty phase, reflects an invalid verdict.[6]
Defendants were charged with first degree murder, which is a capital offense and requires a unanimous verdict. La.C.Cr.P. 782. After the verdict of guilty was returned, the trial judge asked the jury if this was their verdict and also asked if it was by unanimous vote. The jurors responded affirmatively as a group to both questions. The jury was then polled in writing, and unanimity was confirmed by the judge, clerk, and counsel.
The following morning, when the note was given to the trial judge, defendants moved to repoll the jury and requested an evidentiary hearing, both of which were denied. The ruling was based on La.R.S. 15:470, now codified at La.C.E. art. 606, which prohibits a juror from testifying about jury misconduct or any matter that may explain, qualify, or impeach a verdict.
Our courts are required to take evidence upon well pleaded allegations of prejudicial juror misconduct which violates an accused's constitutional rights to due process, to confront and cross-examine witnesses, and to a trial by a fair and impartial jury. Upon a showing that a constitutional violation occurred and that a reasonable possibility of prejudice exists, a court must set aside a verdict and order a new trial. State v. Graham, 422 So.2d 123 (La. 1982), appeal dismissed, 461 U.S. 950, 103 S.Ct. 2419, 77 L.Ed.2d 1309 (1983); State v. Sinegal, 393 So.2d 684 (La.1981). Furthermore, an exception to the rule of La.R.S. 15:470 exists when an unauthorized communication or act by a third person creates an extraneous influence on the jury. State v. Copeland, 419 So.2d 899 (La. 1982), cert. denied, 489 U.S. 1091, 109 S.Ct. 1558, 103 L.Ed.2d 860 (1989); Sinegal. In Sinegal, the jury was exposed to an incorrect statement of law from a 1916 law book. In reversing the defendant's conviction, the Supreme Court held that a new trial is mandated when there is a reasonable possibility that extraneous information considered by the jury affected its verdict. 393 So.2d at 686.
Conversely, jurors are not competent to testify about their deliberations or the mental processes of the jurors during deliberations. Acosta v. Pendleton Memorial Methodist Hospital, 545 So.2d 1053 (La.App. 4th Cir.1989), writs denied, 551 So.2d 637, 638 (La.1989). In State v. Abney, 347 So.2d 498 (La.1977) the Supreme Court cited La.R.S. 15:470 and stated:
[N]o juror is competent to impeach the verdict of the jury on which he served. The rule is founded on the public interest in finality of jury verdicts and in encouraging frankness of discussion among jurors in their deliberations. State v. Ledet, 298 So.2d 761 (La. 1974). This firmly-established rule prevents jurors from impeaching their verdict by disclosure of jury deliberations or even by testimony of misconduct within the jury room. State v. Durr, 343 So.2d 1004 (La.1977).
347 So.2d at 502.
In the case before us, the note giving rise to this controversy was given to the trial judge after an overnight recess, and during the penalty phase of the trial in *139 which photographs of the defendants' families were shown to the jury, letters from family members were read into the record, and one defendant's mother and brother came from Colombia to testify in person. There is nothing in the record to indicate that outside influences may have had something to do with the jurors' second thoughts. In fact, counsel for Velez noted to the trial court that the jury had not been separated and had not been affected by any outside influence.
The trial judge found the note indicated a second thoughts situation, merely a feeling by the two jurors in question, after thinking about their verdict. He did not believe the note in any way affected the validity or legality of the verdict or the constitutional rights of the accused. The trial judge stated, "Our system cannot operate upon second thoughts. We have to have a final adjudication. It has to be final."
Our review of the record indicates the note was sent to the judge the day after the jury unanimously found defendants guilty. After the foreman read the verdict, the judge polled the jury orally as a group and individually in writing. There is no evidence of extraneous influence or coercion by a third person. We find, as did the trial judge, that the defendants' constitutional rights were not jeopardized. The defendants therefore were not entitled to an evidentiary hearing on jury misconduct or a new trial. The matter was within the trial court's discretion and we find, on review, no abuse of that discretion. The trial judge's ruling is affirmed.

Issue #10

ELEMENTS OF THE CRIME
Finally, defendants Velez and Vasquez contend the evidence adduced at trial was insufficient to support their first degree murder convictions. Defendant Cruz raised the issue as an assignment of error but did not brief or argue it in this appeal.
Louisiana law provides that when the issue of sufficiency of evidence is raised on appeal, the critical inquiry of the reviewing court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. State ex rel. Graffagnino v. King, 436 So.2d 559 (La.1983). It is the role of the factfinder to weigh the respective credibilities of the witnesses, and this court will not second-guess the credibility determinations of the trier of fact beyond the sufficiency evaluations required by law.
In order for the State to obtain a first degree murder conviction, it must prove the essential elements of first degree murder beyond a reasonable doubt. In this case, the State sought convictions under paragraph 4 of La.R.S. 14:30 which reads:
A. First degree murder is the killing of a human being:
* * * * * *
(4) When the offender has specific intent to kill or inflict great bodily harm and has offered, has been offered, has given, or has received anything of value for the killing.
According to this statute, the elements which must be proven beyond a reasonable doubt are the killing of a human being, the specific intent to kill or inflict great bodily harm, and the offer or exchange of something of value for the killing.[7]
When the evidence against defendant Velez is viewed in the light most favorable to the prosecution, we find Velez's first degree murder conviction must stand. Velez was present at a meeting where the murder of Barry Seal was discussed. He knew of the Medellin Cartel's reasons for wanting Seal dead, as well as the amount of money which would be paid to whoever completed the contract. At subsequent meetings, Velez expressed his interest in the contract on Seal's life, stating that he *140 would complete the contract even if it meant killing Seal's wife and children in the process. The fingerprints of Velez were found in both vehicles connected to the murder. Additionally, Velez was placed at the murder scene by two eyewitnesses, Robert Lane and Alvin Ricks. The actions of Velez following the shooting are also indicative of guilt. Velez never checked out of the Airport Hilton, but hired a taxi to transport him to Montgomery, Alabama. He was arrested in Meridian, Mississippi after his taxi hit a deer. In his possession were the keys to the getaway car, approximately $3,000 in cash, and luggage containing scrub pants. Eyewitness Robert Lane testified that the driver of the murder vehicle, whom he identified as Velez, wore scrub pants at the time of the murder.
After viewing all of this evidence in the light most favorable to the prosecution, we conclude any rational trier of fact could have found the elements of first degree murder were proven as to defendant Velez beyond a reasonable doubt. The fact that a killing occurred is not disputed; Velez's actions reflect his specific intent to kill the victim; and Velez, the jury could have reasonably concluded, was offered something of value for the killing, which offer he accepted. Velez was therefore properly convicted of first degree murder and sentenced accordingly.
We next consider the evidence presented against defendant Vasquez. The actions of Vasquez were tailored toward the successful completion of the murder of Barry Seal. He obtained the murder vehicle and the getaway car, as evidenced by car rental agreements and testimony. Vasquez arrived in Louisiana one week before Seal was murdered. During this week he checked into three different hotels, one located adjacent to and with a direct view of the Salvation Army halfway house where Barry Seal reported daily. Vasquez provided false information when he purchased the car which was used in the murder. He purchased clothing from a department store, which clothing was later used as props in the murder. Vasquez's fingerprints were found on the batteries inside a walkie-talkie which was found in the murder vehicle.
Within an hour and a half of the murder, Vasquez checked out of the Airport Hilton in New Orleans. While under FBI surveillance, he abandoned a rented Lincoln and threw the keys, a rental agreement, a road map, black knit gloves, and a baseball cap into a dumpster. During post arrest interviews, Vasquez contradicted himself on numerous occasions. He denied ever having rented the red Cadillac, used as the getaway car, and became angry and teary eyed when confronted with a rental agreement in his name. He later admitted renting the car, but denied any knowledge of the walkie-talkies used during the murder. When confronted with the fact that his fingerprints were found on the batteries inside the walkie-talkies, he ultimately admitted purchasing the batteries and testing the radios.
This evidence reflects Vasquez's specific intent to kill Barry Seal. His participation in the murder was significant and his actions represent that of a principal to the murder. The evidence does not, however, prove the offer or exchange of anything of value for the killing as to Vasquez. Vasquez did not enter the picture until February 12, 1986, approximately one week before the murder. The State offered no proof of a connection between the Cartel's contract, or offer, and Vasquez. Proof of a codefendant's connection to the contract (Velez), or the fact that $860 in cash was found on Vasquez when he was arrested (when the alleged bounty was $500,000), is not enough to prove beyond a reasonable doubt that Vasquez was acting pursuant to the contract on Seal's life. Therefore, we cannot affirm the first degree murder conviction of defendant Vasquez.
The evidence and testimony in this record do not provide reasonable support for the apparent conclusion that because the three defendants were acting together, they were all three part of the murder contract put out on Seal's life. The offer or exchange of something of value was an essential element of the offense charged herein *141 which the prosecutor was required to prove with competent evidence. In fact, no evidence whatsoever was offered to link Vasquez to the murder contract. Velez was linked to the contract by the testimony of Max Mermelstein whom the jury apparently found to be a credible witness. The State proved that a contract did exist and that Velez was acting pursuant to that contract. On the other hand, the State did not attempt to prove, and we cannot infer, that Vasquez was likewise acting pursuant to that contract.
In State v. Bay, 529 So.2d 845 (La. 1988), the State sought a first degree murder conviction based on a murder-for-hire contract. The Supreme Court found the evidence of such a contract to be uncorroborated and not credible and reversed the defendant's conviction. In the case before us, we have found no evidence of such a contract as to defendant Vasquez.
In determining the proper remedy for the erroneous conviction of Vasquez, we must consider Louisiana jurisprudence on the subject of principals and the relationship of multiple defendants in a trial.
Neither the law of principals nor the law of conspiracy can provide the legal basis to support the first degree murder conviction of Vasquez. First, the State did not attempt to prove defendants were acting pursuant to a conspiracy; they were neither tried nor convicted of the crime of conspiracy.
The defendants were, however, tried and convicted as principals in the murder of Barry Seal pursuant to La.R.S. 14:24, which provides:
All persons concerned in the commission of a crime, whether present or absent, and whether they directly commit the act constituting the offense, aid and abet in its commission, or directly or indirectly counsel or procure another to commit the crime, are principals.
However, merely because each defendant may be a principal along with other principals does not mean that proof of the requisite elements of the crime against one principal constitutes proof of the same elements against other principals.
In State v. Francis, 486 So.2d 346 (La. App. 3d Cir.1986), writ denied, 492 So.2d 1216 (La.1986), this court found sufficient proof of the requisite specific criminal intent, on the part of the defendant, to kill or inflict great bodily harm on the victim. The defendant was properly convicted as a principal in the second degree murder committed by him and another principal. The court noted that both principals had the requisite specific criminal intent. Similarly, in State v. Clay, 441 So.2d 1227 (La. App. 1st Cir.1983), writ denied, 446 So.2d 1213 (La.1983), the defendant was convicted of second degree murder even though the victim was physically murdered by another individual. The court held:
One who aids or abets in the commission of a crime may be charged and convicted with a higher or lower degree of crime, depending upon the mental element proved at trial. State v. Watson, 397 So.2d 1337 (La.1981), cert. denied, 454 U.S. 903, 102 S.Ct. 410, 70 L.Ed.2d 222 (1981).
441 So.2d at 1234.
In State v. West, 568 So.2d 1019 (La. 1990), the court found the trial judge's jury instructions to be erroneous because the jury was not told it had to find specific intent on the part of this defendant in order to convict this defendant where his two co-perpetrators had previously been convicted of first degree murder. The Supreme Court determined the improper instruction could have led a reasonable juror to believe erroneously that he could transfer the mental state of the defendant's co-perpetrators to the defendant, and thus satisfy the specific intent requirement needed to convict the defendant of first degree murder. 568 So.2d at 1025.
Both State v. Watson, 529 So.2d 94 (La. App. 4th Cir.1988), writ denied, 535 So.2d 740 (La.1989), and State v. Smith, 450 So.2d 714 (La.App. 4th Cir.1984) involved the use of weapons by one of two codefendants. In Watson, an armed robbery and aggravated rape case, the evidence showed that one defendant carried a gun from the beginning of the encounter with the victim, *142 fired a shot from the gun, and held it to the victim's head while the second defendant raped her. The jury could have reasonably concluded that the second defendant knew of the gun and therefore aided in the commission of the aggravated rape. 529 So.2d at 98. By contrast, in Smith, one defendant's armed robbery conviction was reduced to simple robbery because there was no evidence he knew of his codefendant's impulsive decision to pick up and use a hammer during the course of the robbery.
Given this jurisprudence, we cannot affirm Vasquez's first degree murder conviction. We need not, however, discharge him. The discharge of the defendant is neither necessary nor proper when the evidence supports a conviction on a lesser and included offense which was a legislatively authorized responsive verdict. State v. Byrd, 385 So.2d 248 (La.1980). See also Bay, supra; State v. Jones, 426 So.2d 1323 (La.1983); and State v. Nugent, 580 So.2d 1002 (La.App. 3d Cir.1991). The evidence does support a guilty verdict of the lesser and included offense of second degree murder and we will order entry of judgment against Vasquez in accordance therewith.
We will not review the sufficiency of the evidence offered against defendant Cruz as he abandoned this assignment of error.

DECREE
For the foregoing reasons, we affirm the convictions and sentences of Miguel Velez and Luis Carlos Quintero-Cruz. We set aside the conviction and sentence of Bernardo Antonio Vasquez and remand to the district court for entry of judgment of guilty of second degree murder and resentencing in accordance with La.R.S. 14:30.1.
AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.
NOTES
[1] Ballistics comparisons between slugs removed from the closet area of Mermelstein's home and those removed from Seal's Cadillac proved conclusively that they were fired from the same Mac-10 machine gun which was recovered from the getaway vehicle on the day of the killing.
[2] The evidence suggested that Campo may have brought the Mac-10 machine gun which was used to kill Seal and the Uzi pistol found in the getaway vehicle from Miami to New Orleans. Campo borrowed an Uzi from Jose Countin, a firearms dealer in Miami, after inquiring about the purchase of several weapons. Campo never returned the Uzi which Countin had loaned him. Countin identified the Uzi found in the getaway vehicle as the same one which he had loaned to Campo. Countin also identified defendant Velez as having accompanied Campo to his store.
[3] Our review of the record reveals the following black venirepersons whose race was noted in the record and who were challenged by the State, over defense objections: Rious, Simmons, Broussard, Griffin, Pierfax, Charles, Dugas, Batchan, Antoine, Hawkins, Cormier, Fontenot, and Dellafosse. Jurors Edwards and Bellard were challenged without objection, and we can only surmise that they are black because of an oral listing given by the trial judge during the course of voir dire.
[4] This suggested inference is based on the unacceptable belief that all black jurors will vote on the basis of racial bias. See State v. Collier, 553 So.2d 815 (La.1989).
[5] We will consider this issue given our analysis concerning the recordation of the jury charge conference, even though the defendants have not complied with the requirement of La.C.Cr.P. art. 807 that a proffered special charge must be in writing.
[6] The note read as follows:

Your Honor,
I made a decision of 2nd degree murder but was told it had to be 1st degree murder because of money involved.
What can I do? I feel I was coerced. I'm having a hard time living with 1st degree. Please tell me something.
 W. Hartnell
And I'm not the only one.
I, Edna Shaw, feel that I was coerced in making a decision of 1st degree murder that I can not live with.
 Edna Shaw.

[7] La.R.S. 14:10 defines specific intent as "that state of mind which exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act." Specific intent is a state of mind and need not be proven as fact, but rather, it may be inferred from the circumstances of the crime and the actions of the defendant. State v. Graham, 420 So.2d 1126 (La.1982).