# STATE OF LOUISIANA

# COURT OF APPEAL, THIRD CIRCUIT

## 12-1052

STATE OF LOUISIANA

VERSUS

JAMAL JAMES CARMOUCHE

**********

APPEAL FROM THE
FIFTEENTH JUDICIAL DISTRICT COURT
PARISH OF LAFAYETTE, NO. CR 131894
HONORABLE MARILYN C. CASTLE, DISTRICT JUDGE

**********

JAMES T. GENOVESE
JUDGE

**********

Court composed of Sylvia R. Cooks, James T. Genovese, and John E. Conery, Judges.

AFFIRMED.

Edward K. Bauman
Louisiana Appellate Project
Post Office Box 1641
Lake Charles, Louisiana 70602
(337) 491-0570
COUNSEL FOR DEFENDANT/APPELLANT:
    Jamal James Carmouche


Michael Harson
District Attorney—Fifteenth Judicial District
Pat Magee, Assistant District Attorney
Post Office Box 3306
Lafayette, Louisiana 70502
(337) 232-5170
COUNSEL FOR APPELLEE:
    State of Louisiana

**GENOVESE, Judge.**

In this criminal case, by virtue of a responsive verdict, a jury found Defendant, Jamal James Carmouche, guilty of manslaughter. Defendant appeals, alleging insufficiency of the evidence and trial court error in instructing the jury regarding flight. For the following reasons, we affirm Defendant's conviction.

## FACTUAL AND PROCEDURAL HISTORY

On September 18, 2010, the victim in this case, Marcus Despanie, was shot and killed. Defendant was indicted for the second degree murder of Mr. Despanie. Following a trial by jury, Defendant was found guilty of the responsive verdict of manslaughter and was sentenced to serve thirty-five years at hard labor with credit for time served. At the conclusion of sentencing, the State charged Defendant as a habitual offender, which is the subject of a separate appeal and opinion. Defendant is now before this court challenging his manslaughter conviction.

## ERRORS PATENT

In accordance with La.Code Crim.P. art. 920, all appeals are reviewed for errors patent on the face of the record. In our review of the record, we find no errors patent.

## ASSIGNMENTS OF ERROR

Defendant presents the following two assignments of error for our consideration:

I. The evidence adduced at trial was insufficient to support a conviction for either second degree murder or manslaughter.

II. It was error for the [t]rial [c]ourt to instruct the jury regarding flight.

*SUFFICIENCY OF THE EVIDENCE*

By this assignment of error, Defendant argues that the evidence adduced at trial was insufficient to support a conviction for either manslaughter or second degree murder. Defendant contends there is no evidence of heat of passion as required for a finding of manslaughter.

The analysis for a claim of insufficient evidence is well-settled:

> The standard of appellate review for a sufficiency of the evidence claim is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979); *State v. Mussall*, 523 So.2d 1305 (La.1988). A determination of the weight of evidence is a question of fact, resting solely with the trier of fact who may accept or reject, in whole or in part, the testimony of any witnesses. *State v. Silman*, 95-0154 (La.11/27/95), 663 So.2d 27, 35. A reviewing court may impinge on the factfinding function of the jury only to the extent necessary to assure the *Jackson* standard of review. *State v. Bordenave*, 95-2328 (La.4/26/96), 678 So.2d 19, 20. It is not the function of an appellate court to assess credibility or re-weigh the evidence. *Id*.

*State v. Macon*, 06-481, pp. 7-8 (La. 6/1/07), 957 So.2d 1280, 1285-86.

Defendant was charged with second degree murder defined in La.R.S. 14:30.1(A)(1) as "the killing of a human being . . . [w]hen the offender has a specific intent to kill or to inflict great bodily harm[.]" "Specific criminal intent is that state of mind which exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act." La.R.S. 14:10(1). Specific criminal intent may be inferred from the circumstances present in the case and the actions of the defendant. *State v. Carroll*, 95-859 (La.App. 3 Cir. 1/31/96), 670 So.2d 286.

Defendant, however, was found guilty of manslaughter, a responsive verdict to second degree murder. Manslaughter is defined in La.R.S. 14:31(A) as:

> (1) A homicide which would be murder under either Article 30 (first degree murder) or Article 30.1 (second degree murder), but the

2

offense is committed in sudden passion or heat of blood immediately caused by provocation sufficient to deprive an average person of his self-control and cool reflection. Provocation shall not reduce a homicide to manslaughter if the jury finds that the offender's blood had actually cooled, or that an average person's blood would have cooled, at the time the offense was committed; or

(2) A homicide committed, without any intent to cause death or great bodily harm.

(a) When the offender is engaged in the perpetration or attempted perpetration of any felony not enumerated in Article 30 or 30.1, or of any intentional misdemeanor directly affecting the person; or

(b) When the offender is resisting lawful arrest by means, or in a manner, not inherently dangerous, and the circumstances are such that the killing would not be murder under Article 30 or 30.1.

In *State v. Brown*, 00-1021, p. 6 (La.App. 3 Cir. 1/31/01), 780 So.2d 536, 540, *writ denied*, 01-912 (La. 2/1/02), 807 So.2d 854, this court noted:

As explained by the Louisiana Supreme Court in *State v. Snyder*, 98-1078 (La.4/14/99), 750 So.2d 832, "sudden passion" and "heat of blood" are not elements of manslaughter. "Rather, they are mitigatory factors in the nature of a defense which exhibit a degree of culpability less than that present when the homicide is committed in the absence of these factors." *Id*. at p. 4, 837-38. If a defendant establishes, by a preponderance of the evidence, the presence of these mitigating factors, he or she is entitled to a verdict of manslaughter. *Id. See also State v. Lombard*, 486 So.2d 106 (La.1986).

*See also State v. Johnson*, 06-623 (La.App. 3 Cir. 11/2/06), 941 So.2d 696, *writ denied*, 06-3024 (La. 9/14/07), 963 So.2d 995.

An analysis of the issue herein is found in *State v. Lewis*, 09-1404 (La. 10/22/10), 48 So.3d 1073. Following a bench trial, the sixteen-year-old defendant charged with second degree murder was found guilty of the lesser offense of manslaughter and sentenced to thirty years at hard labor. On appeal, the fifth circuit found the evidence at trial supported the responsive verdict of manslaughter because the evidence was sufficient to prove second degree murder. *State v. Lewis*, 08-1317 (La.App. 5 Cir. 5/26/09), 16 So.3d 385. The appellate

court then vacated the sentence as excessive. Finding these two rulings at odds, the State's application for writs to the Louisiana Supreme Court was granted, the conviction was affirmed, and the sentence was reinstated. Our supreme court reasoned:

> On appeal, defendant not only challenged his sentence but also argued that the evidence did not support the court's verdict of manslaughter or any other responsive verdict because the only rational interpretation of the evidence at trial was that he retrieved the gun to insure that no one got hurt and that the weapon then discharged accidentally. [*State v.*] *Lewis*, 08-1317 at 8, [(La.App. 5 Cir. 5/26/09),] 16 So.3d [385] at 390. Addressing that argument first, the court of appeal agreed with the state that because the evidence at trial was sufficient to prove the charged offense of second degree murder, a specific intent homicide, it was also sufficient to support a conviction for manslaughter. In that regard, the court of appeal followed settled jurisprudence that specific intent to kill may be inferred from the act of pointing a gun and firing at a person in close proximity. *See, e.g., See State v. Tassin*, 536 So.2d 402, 411 (La.1988)(pointing and firing a gun at point-blank range supports an inference of specific intent to kill); *State v. Noble*, 425 So.2d 734, 736 (La.1983)(same). The court of appeal also applied the settled rule on review of the sufficiency of evidence that "the fact finder is given much discretion in determinations of credibility and evidence, and the reviewing court will only impinge on his discretion to the extent necessary to guarantee the fundamental protection of due process of law." *Lewis*, [16 So.3d at 391] (citing *State v. Mussall*, 523 So.2d 1305, 1309 (La.1988)). Thus, with respect to whether defendant aimed and fired the gun deliberately at the victim's head from close range, as Derrick Johnson and Isaac Bush testified, or accidentally before he brought the weapon all of the way up, as defendant claimed, the Fifth Circuit could not say that the trial court "was clearly wrong in its evaluation of the witnesses' testimony and its credibility call." *Id.*, [16 So.3d at 392]. Given that factual premise, the majority concluded that although defendant did not claim at trial that he had been provoked and fired in the heat of passion, or make any claim on appeal that the evidence otherwise revealed those essentially mitigatory factors which may reduce the degree of a homicide from murder to manslaughter, *State v. Lombard*, 486 So.2d 106, 110 (La.1986), the evidence at trial supported the verdict of manslaughter because it could have sustained a verdict for second degree murder defined as a specific intent homicide. *Lewis*, [16 So.3d at 391] ("When a defendant does not object to a legislatively responsive verdict, the defendant's conviction will not be reversed, whether or not that verdict is supported by the evidence, as long as the evidence is sufficient to support the offense charged.") (citing *State ex rel. Elaire v. Blackburn*, 424 So.2d 246, 252 (La.1982)).

4

*Lewis*, 48 So.3d at 1076-77.

In the instant case, Defendant concedes that he did not object to the jury instruction regarding the responsive verdict of manslaughter. The record reflects that the jury was instructed as follows:

> The defendant in this case is charged with second degree murder of Marcus Despanie. Second degree murder, for purposes of these charges, is the killing of a human being when the offender has a specific intent to kill or inflict great bodily harm.

> Thus, in order to convict the defendant of second degree murder, you must find that the defendant killed Marcus Despanie and that the defendant acted with a specific intent to kill or inflict great bodily harm.

> To convict the defendant of the offense charged, you must find beyond a reasonable doubt that the State proved every element of second degree murder.

> If you are not convinced that the defendant is guilty of the offense charged, you may find the defendant is guilty of a lesser included offense if you are convinced beyond a reasonable doubt the defendant is guilty of such lesser offense.

> And I'm now going to talk to you about the lesser responsive offenses. The first one is manslaughter. Manslaughter is the killing of a human being when the offense would have been second degree murder, but the killing is committed in sudden passion or heat of blood immediately caused by provocation sufficient to deprive an average person of his self-control and cool reflection.

> The measure of the adequacy of the provocation to cause a defendant to act in sudden passion or heat of blood is the average or ordinary person and not the peculiar psychological characteristics of a particular defendant.

> Provocation shall not reduce a homicide to manslaughter if the jury finds that the offender's blood had actually cooled or that an average person's blood would have cooled at the time the offense was committed.

At trial, Jeremy Walker identified Defendant as the shooter. He testified that he met Defendant in Abbeville, Louisiana, and had known him for about a month prior to the offense. On September 17, 2010, the day prior to the offense, Walker and Defendant had gone to Defendant's sister's apartment on the north side of

5

Lafayette and later on went to Defendant's grandmother's home. Walker was wearing a t-shirt, either white or black, and blue jeans.

In the early morning hours of September 18, 2010, Walker and Defendant left Defendant's grandmother's house and walked up Ambrose Street. According to Walker, Defendant got into an altercation on the corner of Ambrose and Pierce Streets. Walker did not see the altercation begin; however, he looked when he heard the scuffle. About a minute or more later, two gun shots rang out, and the victim was dead on the ground. When asked who shot the victim, Walker replied, "Jamal." When asked if he knew Defendant shot the victim, Walker replied, "I seen him."

Walker admitted that in a prior statement, he indicated that he did not see Defendant shoot the victim. Walker maintained, however, that he was not truthful at that time because he feared for the safety of his family.

A surveillance video obtained from footage recorded on September 18, 2010, by a pole camera located at the Gilman Substation of the Lafayette Utilities System was introduced into evidence. The pole camera was located directly across from the Carney Funeral Home on Pierce Street. Detective Larry Theriot with the Lafayette Police Department testified that he reviewed the footage and observed several males walking in and out of the funeral home and a male standing at the stop sign smoking a cigarette. Suddenly, two males were seen fleeing north/northeast. He also saw one of the men drop an object, pick it up, and then continue running with the other man. The video was subsequently viewed by the jury.

We note that the surveillance video contained on a portable hard drive is in black and white and is of very poor quality. Detective Theriot's description of what he saw on the video is an accurate depiction of what was shown to the jury.

6

Walker was shown the surveillance video, and he identified himself as the male wearing a white shirt. Walker also identified Defendant as the male wearing a sky blue shirt. Walker testified that the flickering light in the video was from the cigarette he was smoking. Walker also stated that he was seen picking up a cell phone in the video. According to Walker, he and Defendant ran across the highway until they reached a hotel. They called a taxicab and returned to Defendant's sister's apartment. A report from Dixie Cab showing the pickup and delivery data for September 18, 2010, from 3:01 a.m. to 12:31 p.m., was introduced into evidence. The report reflects that a cab was dispatched at 4:20 a.m. to the Howard Johnson Hotel, and the drop-off address was "Cypress Shadow 23." A lease agreement was also introduced by the State to show that Defendant's sister, Whitley Hornes, leased an apartment at Cypress Shadows.

Later that day, Walker and Defendant went to the Greyhound bus station in Lafayette and boarded a bus to New Orleans. A passenger list for departures on September 18, 2010, was introduced into evidence. The passenger list indicates that Walker purchased two tickets to New Orleans to depart on September 18, 2010. Walker is listed as one of the two passengers, and Martin Edmond, Defendant's alleged alias, was listed as the second passenger.

On cross-examination, Walker testified that he was a rapper and that "Murder" was his stage name. Walker's mother had thrown him out of her home, and he had been homeless for about four or five months before meeting Defendant. Walker further testified that on the day of the offense, he had smoked a large quantity of marijuana, that he had nowhere to go, and that he was going wherever Defendant was going. At 3:00 a.m., he and Defendant were walking and talking. Walker was not aware of any plans for Defendant to fight in the area. He and Defendant came upon the victim who was with four or five other people. As

7

Defendant approached the group, Walker stayed behind because he did not know the victim or any of the people around him. He could not hear what they were saying. Next, punches were thrown with the victim hitting Defendant first. Then, gunshots were fired. Walker saw Defendant shoot the victim. According to Walker, Defendant was trying to get away from the victim when Defendant pulled out his gun and shot the victim.

Walker did not recall passing by anyone while he and Defendant were walking, and he did not see anyone in their walking path. Walker testified that he did not know the victim or any other person with the last name Despanie, as he was not from the area. He did not recall seeing a person by the last name of Despanie as they were walking toward the victim.

Walker testified that two shots were fired. He did not know what to do, so he took off running. He and Defendant ran to an alley, crossed a highway, and then stopped running. When they reached a hotel, they called a taxi and went to Defendant's sister's apartment. Walker stated that he went to New Orleans because he thought he was in trouble. Walker and Defendant stayed in New Orleans for one day. While in New Orleans, Defendant's father called him and told him to call a certain detective. Walker encouraged Defendant to call the detective. Defendant then used Walker's phone to call the detective. Defendant's sister gave Walker and Defendant a ride home the following day.

When asked why he did not call the police after the shooting, Walker stated that he was with Defendant and was uncertain if Defendant intended to kill him, too. Walker was with Defendant during his entire stay in New Orleans. Walker testified that he did not call the police while they were in New Orleans because he did not think it would do any good. He maintained that he was not an accomplice to murder.

Walker acknowledged that his nickname was "Murder." Walker testified that he told police in his first statement that he saw Defendant shoot someone; however, he admitted that he lied about his whereabouts after the shooting. Walker had told police that he had gone home, although he had actually gone to New Orleans. Walker was then shown a transcript of his first statement wherein he was asked if he saw what happened to the victim. Walker replied, "No ma'am, not really. I just looked back, and he was on the ground, lying down." Walker maintained at trial that the statement was inaccurate.

Walker did not know if Defendant surrendered himself after returning to Lafayette. He went straight to his mother's house, and she allowed him to stay. Walker maintained that he did not shoot the victim, as evidenced by the surveillance video. Walker testified that he was wearing either a white or black t-shirt at the time of the offense, although, in his statement to police, he reported that he was wearing a black t-shirt. Walker denied changing his statement after seeing the surveillance video, which indicated he was wearing a white t-shirt.

On re-direct examination, Walker testified that the first time he had seen the surveillance video was at trial. The only thing Defendant told Walker about the shooting was that he hoped the victim was not dead. Defendant made that statement to Walker as they were running from the scene. Walker affirmed that he saw Defendant shoot the victim. When asked why he left the murder scene and the city with someone he had just seen kill a man, Walker replied that he could have been killed, and he had nowhere to go.

The testimony of Terrance Terrell Despanie (Terrance), the victim's nephew, placed Defendant and Walker at the scene and indicated that Defendant was armed with a gun. Terrance testified that at 4:00 a.m. on September 18, 2010, he was on Ambrose Street on the side of Carney Funeral Home. He had met with

9

his family at the Duke Lounge located across the street from the funeral home following his release from jail. As soon as Terrance reached Pierce Street where he could see the funeral home, he saw the victim sitting with his family. About twenty minutes later, he saw Defendant walking up Ambrose Street toward the funeral home to North Pierce Street. Terrance thought he and Defendant were going to fight because he had been incarcerated for touching a girl that was possibly Defendant's girlfriend. Terrance made eye contact with Defendant, but Defendant kept walking and passed him. Terrance recalled that Defendant was wearing a blue collared shirt. He also testified that he saw a man known as "Murder," the nickname of Jeremy Walker, walking a few steps behind Defendant and wearing a white shirt.

According to Terrance, Defendant proceeded to the corner of Ambrose and North Pierce Streets. He saw a black gun in Defendant's hands. To avoid a fight with the armed man, he turned his head down and paid no attention to Defendant. He then heard four shots and took off running down the driveway of the funeral home. His uncle had been shot and was dead before he could get to him. Terrance testified that he wanted to retaliate against Defendant. When asked why, he stated:

> I feel, basically, it's over a girl. Like, when I went - - When I got incarcerated, my uncle was there. And my uncle was telling her about herself, like why she ain't really do what she did to me to Jamal, you know.

> And I felt like she said something to him, and it just wind up being like my uncle hit her instead of me. And he went straight to my uncle and did what he had to do.

Terrance indicated that he did not see Defendant fire his weapon, nor did he see Defendant after the shots were fired. He saw "Murder" running from the scene. He was shown the surveillance video, and, based on the clothing of the two

10

men shown in the video, he identified the person on the right as Defendant wearing the darker shirt and the person to the left as "Murder" wearing the white shirt.

On cross-examination, Terrance testified that prior to his arrival on the scene, he had been in jail for two hours following his arrest for the simple battery of Sherika Hamilton. He knew that Ms. Hamilton was "seeing" Defendant, but he was not sure if Ms. Hamilton was Defendant's girlfriend. When Terrance got out of jail, he started walking home. After he arrived at home, he left in his mother's car, picked up a friend, Keland, and drove to the scene. He and Keland were sitting on the side of the funeral home, talking and smoking marijuana, when he saw Defendant and "Murder" walk out of Ms. Hamilton's yard towards the funeral home. Defendant looked at him, but did not say anything to him and kept walking. Defendant stopped and took a seat near a basket by the funeral home and checked out the scenery.

According to Terrance, Defendant proceeded to the corner illuminated by a street light. He could see a black gun in Defendant's hands, but he did not know the type. Terrance did not recall telling police in a statement taken three days after the offense that the gun was a .45 or nine millimeter and not a .22 or small gun. He also did not recall telling police that he was unable to see the color of the gun.

Terrance admitted that he continued to smoke marijuana after Defendant passed him. He estimated that about two minutes elapsed before he heard gunshots. He did not know that his uncle was in the area at the time of the gunshots. He had seen his uncle earlier after leaving the jail. When he saw Defendant at the corner, he "put two and two together," but did not see who fired the gun.

The testimony of Carlos Hamilton, also a nephew of the victim, put Defendant at the scene and indicated that the victim was sitting down when he was

11

shot. Hamilton testified that on the night of the offense, he was at the nightclub across the street from the scene. The nightclub had closed at 2:00 a.m., and he remained in the area, talking and drinking. He did not see Defendant that night until the victim was shot. Hamilton saw Defendant flee from the scene. Hamilton was urinating on the side of the funeral home when he heard the first gun shot. He zipped his pants and started moving when he heard a second shot. Hamilton ran to the front of the funeral home, saw the victim's body drop to the ground, and saw Defendant take off running. According to Hamilton, no one else was around the victim. Hamilton then ran to the victim and tried to rouse him, but he was not moving. Hamilton called 911 and told the operator that his uncle had been shot. When the 911 operator asked Hamilton who shot the victim, he said he did not know. Hamilton testified that he lied to the operator because he wanted to be a vigilante and get revenge. Hamilton intended to find Defendant and kill him. Hamilton stated that the victim was sitting down on a rail at the time he was shot. Hamilton estimated that Defendant was no further than five feet from the victim when he shot him.

On cross-examination, Hamilton testified he was twenty-one years old at the time of the offense and had one prior conviction for simple drug possession in 2008. On the night of the offense, Hamilton went to the nightclub around 10:00 p.m. and had his first drink around 11:00 p.m. He consumed a pint of alcohol that evening. According to Hamilton, his state of mind at the time was pretty good. He recalled giving a statement to police wherein he indicated that he saw his uncle's shooting and saw him fall down. After Hamilton was shown a transcript of his statement to police, he did not deny telling police he had been drinking and was having trouble standing up.

According to Hamilton, the lighting from the street light was pretty good. He stated he was about fifteen feet or so away from where he saw the victim fall. He did not see anyone else around. Before he went to urinate, he had seen the victim sitting on the rail, crying because he had been in a fight forty minutes earlier with another one of Hamilton's uncles. The victim was not wearing a shirt. Hamilton spoke with the victim about five to six seconds before excusing himself to go use the bathroom. He did not see anyone around before he walked away. He also testified that the relationship between the victim and Defendant was not "peaches and cream." The two men did not associate with each other, and they were not friends.

When asked if he saw Defendant fire a weapon to shoot the victim, Hamilton responded, "No, I didn't." He explained that no one else could have shot the victim. Although he was intoxicated, he maintained that he would not put an innocent man in jail. He stated, "But I know what I seen, and I know why my uncle is not here to this day." He testified that Defendant was wearing a blue shirt and blue shorts. He maintained he never told police that he actually saw Defendant shoot the victim. He recalled hearing three shots. Hamilton was referred to his prior statement to police wherein he indicated that Defendant had to be the shooter:

> Who was that, son? That's only - - But I just want to make sure who that was. I'm like, man, that was just Jamal, that dude from Abbeville. He was running. So I'm putting two and two together. That got to be the shooter, Jamal. I mean, I seen the shirt. It was a light-colored kind of light greenish. It was green. But it was like kind of like the St. Patrick's Day green.

Hamilton explained at trial that he saw Defendant run after the victim's body slowly hit the ground. With regard to the discrepancy involving the color of the Defendant's shirt, he asserted that the shirt was blue, but had a green emblem on it.

On redirect examination, Hamilton was referred to his prior statement wherein he stated, "I seen him run. I ain't seen the dude from Abbeville." Hamilton was asked to whom he was referring as the runner. He stated that he was talking about Defendant.

Lastly, Dr. Bruce Wainer, a forensic pathologist, testified about his examination of the victim's body and the wounds sustained by the victim. Dr. Wainer stated that the victim sustained a gunshot wound to the left upper chest. He identified the entrance wounds with stippling caused by the muzzle of weapon. Dr. Wainer explained that the weapon was close enough to the body surface to allow propellant for the projectile to strike the surface of the skin. He referred to the distance as an intermediate range, usually about several inches to a foot. The projectile entered the left shoulder in the soft tissue, struck the subclavian artery, and came to rest in the back beneath the scapula. A small caliber, full-metal jacketed projectile was recovered from the back location. The bullet traveled from front to back, slightly upward, and left to right.

The victim also sustained a gunshot wound to the head. The entrance was located just in front of the left ear. There was no stippling of the wound. The projectile traveled in a backward and downward path and ended up in the posterior part of the meningeal membranes where it was recovered. The bullet was the same type of projectile recovered from the first wound. Dr. Wainer considered the gunshot to the head to have been fatal and the gunshot wound to the chest to have been potentially fatal.

A toxicology screen was also performed on the victim. The victim's blood toxicology was positive for ethanol at 0.25 percent. His urine toxicology was also positive for ethanol and was 0.369 percent. Dr. Wainer explained that a blood alcohol level of anything above 0.08 is considered impaired and is the legal limit

14

for driving. In the instant case, the victim's blood alcohol was well above the legal limit and in a range were one would expect the victim to be intoxicated.

Although there are discrepancies in the trial testimony, i.e., the number of shots fired, the color of the shirts worn by Defendant and Walker, and who was near the victim at the time of the offense, we find that the evidence at trial supported the verdict of manslaughter because it could have sustained a verdict for second degree murder. *State ex rel. Elaire v. Blackburn*, 424 So.2d 246 (La.1982), *cert denied*, 461 U.S. 959, 103 S.Ct. 2432 (1983). Defendant was positively identified as the shooter by Walker, an eyewitness who fled the scene with Defendant after the shooting. Walker also identified himself and Defendant in a surveillance video recorded during the time of the offense that placed both men at the scene. Walker's testimony was further supported by Terrance Terrell Despanie and Carlos Hamilton, whose testimonies indicated that the armed Defendant was in the area at the time of the shooting and fled the scene after the shooting.

The testimony and evidence also showed that Defendant had the specific intent to kill or to inflict great bodily harm as evidenced by his actions during and after the commission of the offense. Defendant shot the victim twice, once at close range, and then fled the scene and, later that morning, the city. This court has stated that the act of aiming a firearm directly at a victim is indicative of intent to kill the victim. *State v. Clark*, 93-1470 (La.App. 3 Cir. 10/5/94), 643 So.2d 463, *writ denied*, 94-2715 (La. 2/9/95), 649 So.2d 418. Moreover, specific intent may be inferred when a wound is inflicted at close range as seen in *State v. Boyer*, 406 So.2d 143 (La.1981), or when a weapon is pointed directly at the victim as seen in *State v. Procell*, 365 So.2d 484 (La.1978), *cert. denied*, 441 U.S. 944, 99 S.Ct. 2164 (1979). *See also State v. Bell*, 471 So.2d 277 (La.App. 4 Cir. 1985). We are mindful, however, that a shooting at close range does not prove specific

15

intent.  This court articulated the following in *State v. Reed*, 00-1537, pp. 7-8 (La.App. 3 Cir. 3/6/02), 809 So.2d 1261, 1266, *writ denied*, 02-1313 (La. 4/25/03), 842 So.2d 391:

> [A]lthough the jurisprudence supports the proposition that specific intent can be inferred from the fact that the victim was shot at close range, that jurisprudence relies on the support of other circumstances indicating specific intent.  "The jury should not be permitted to believe that just because someone is killed, the law regards it as a reasonable inference that someone intended to harm him."  *State v. Davis*, 411 So.2d 2, 6 (La.1982).

In the instant case, circumstances in addition to the close-range shooting of the victim include the fact that Defendant fled the scene and the city to avoid capture.

> Evidence of flight, concealment, and attempt to avoid apprehension is relevant.  It indicates consciousness of guilt and, therefore, is one of the circumstances from which the jury may infer guilt.  This rule applies notwithstanding that the evidence may disclose another crime.  *State v. Brown*, La., 322 So.2d 211 (1975); *State v. Graves, La.*, 301 So.2d 864 (1974); *State v. Nelson*, 261 La. 153, 259 So.2d 46 (1972).  See also *State v. Lane, La.*, 292 So.2d 711 (1974); *State v. Johnson*, 249 La. 950, 192 So.2d 135 (1966); *State v. Goins*, 232 La. 238, 94 So.2d 244 (1957); 29 Am.Jur.2d, Evidence, §§ 280 et seq., pp. 329 et seq.  A court may admit a wide range of evidence to prove flight, concealment, and attempt to avoid apprehension.  *State v. Nelson*, *supra*.

*State v. Davies*, 350 So.2d 586, 588 (La.1977).  Additionally, the record indicated that Defendant and victim were clearly not on friendly terms and that acrimony existed between the two men prior to the offense.  The record also indicated that a scuffle ensued between the men just prior to the shooting with the victim throwing the first punch.  Although motive is not an essential element of second degree murder, "a lack of motive may properly be considered as a circumstance mitigating against specific intent."  *State v. Mart*, 352 So.2d 678, 681 (La.1977).  Accordingly, we find no merit in this assignment of error.

16

## JURY INSTRUCTION REGARDING FLIGHT

By this assignment of error, Defendant argues that the trial court erred in instructing the jury regarding flight. Defendant contends that after the offense he returned to his sister's house where he and Walker stayed the remainder of the night. The following day, he took a bus to New Orleans and had every intention of returning to Lafayette after his trip to Panama City, Florida, yet returned the subsequent day. Defendant maintains that these facts do not describe a situation where someone immediately flees from a murder scene and stays away in hiding. He further argues his behavior is not that typically expected of a murderer trying to hide from justice.

At the conclusion of closing arguments, Defendant made an oral motion for a mistrial, asserting that no evidence had been introduced about flight other than the State's argument, to which Defendant objected. In the alternative, Defendant argued that the instruction about flight needed to be removed and the jury admonished to disregard everything said about flight. The trial court responded:

> Well, if you notice, the instruction says: If you find the defendant fled immediately after a crime was committed or after he was accused of a crime, the flight alone is not sufficient to prove the defendant guilty. It may be considered along with all other evidence, and you must decide whether such flight was due to conscious guilt or reasons unrelated to guilt.

The trial court found the instruction to be proper in light of the evidence that indicated Defendant left town. It was up to the jury to decide if Defendant did, in fact, leave town, and, if he did leave town, whether it was because of guilt or some other reason. Both motions were denied. The jury was instructed accordingly.

The evidence in the record clearly indicates that Defendant and Walker fled from the scene immediately following the shooting. They subsequently secured a taxicab to further distance themselves from the scene, and then boarded a bus for

New Orleans later that day. We find that the jury instruction was proper. Accordingly, there is no merit in this assignment of error.

## DISPOSITION

For the reasons set forth above, the Defendant's conviction is affirmed.

**AFFIRMED.**