# STATE OF LOUISIANA

## COURT OF APPEAL, THIRD CIRCUIT

### 13-883

STATE OF LOUISIANA

VERSUS

ISIAH DEMON LIVELY

**********

APPEAL FROM THE
SIXTEENTH JUDICIAL DISTRICT COURT
PARISH OF IBERIA, DOCKET NO. 10-607
HONORABLE LORI A. LANDRY, DISTRICT JUDGE

**********

JAMES T. GENOVESE
JUDGE

**********

Court composed of Elizabeth A. Pickett, James T. Genovese, and Phyllis M. Keaty, Judges.

**AFFIRMED.**

Paula C. Marx
Louisiana Appellate Project
Post Office Box 80006
Lafayette, Louisiana  70598-0006
(337) 991-9757
COUNSEL FOR DEFENDANT/APPELLANT:
    Isiah Demon Lively

J. Phil Haney
District Attorney—Sixteenth Judicial District
Angela B. Odinet—Assistant District Attorney
415 Main Street
St. Martinville, Louisiana  70582
(337) 394-2220
COUNSEL FOR APPELLEE:
    State of Louisiana

**GENOVESE, Judge.**

In this criminal case, Defendant, Isiah Demon Lively, was convicted by a jury of the charges of attempted second degree murder and attempted armed robbery. He was sentenced on the attempted murder conviction to twenty years at hard labor without benefits; he was sentenced on the attempted armed robbery conviction to ten years at hard labor without benefits to run concurrently with the twenty-year sentence. Subsequent thereto, he was adjudicated a second felony offender. The trial court then set aside his twenty -year sentence for attempted second degree murder and imposed a new sentence as a second felony offender of twenty-five years at hard labor without benefits to run concurrently with his ten-year sentence for attempted armed robbery. He has appealed, alleging insufficiency of the evidence, trial court error in not giving his requested jury instruction on eyewitness identification, and trial court error in failing to suppress the victim's identification of him. Defendant does not appeal his sentences. For the following reasons, we affirm Defendant's convictions and adjudication.

## FACTS

Russell Prejean, a Borden Milk route salesman and victim of these crimes, and his assistant, Ronald Hill, were making a delivery to the A&M Grocery in Jeanerette, Louisiana, around 8:30 a.m., on December 18, 2010. The store, as was its custom, paid its bill in cash, and Mr. Prejean put the cash in his pocket. When they exited the store, Mr. Prejean went to the cab of the truck, while Mr. Hill went to the back of it. When Mr. Prejean reached for the door of the truck to close it, he "felt some material on [his] arm, and [he] thought it was Mr. Hill coming to tell [him] something. So [he] turned around. And when [he] did, [he] looked at a .45 in [his] face."

The gunman demanded money, and Mr. Prejean told him he had none. The gunman said he had seen Mr. Prejean come out of the store and knew he had money. Mr. Prejean testified, "[T]he next thing I knew[,] I was shot in the leg, and I was on the ground when I realized it."

Mr. Prejean identified the gunman as a black male with "short dreadlocks and a little bit of facial hair." He thought the dreadlocks were "probably an inch or two." When Mr. Prejean had first looked at the gunman, he had noticed a black and white shirt. After he was shot, he noticed the gunman "had orange, light orange, baggy pants." Mr. Prejean saw the gunman walk across the road and go behind the first house, then he lost sight of him. Mr. Prejean testified that he and the gunman "looked at each other in the face" and that the incident lasted fifteen to twenty seconds.

The bullet shattered Mr. Prejean's femur and hit his sciatic nerve. He now has a rod from his hip to his kneecap with two screws; he uses a cane; and, he is unable to work. He spent three weeks in the hospital and then went through extensive rehabilitation.

A few days after the shooting, Mr. Prejean briefly saw a picture of Defendant on a television news report. Trial exhibits showed the dates, times, and content of news stories concerning the shooting, including a photograph of Defendant. Mr. Prejean recognized the photo of the man he saw on television as the man who shot him. He thinks he saw it "a couple of days. But [he] was heavily doped up. So if [he] did see it, it was only briefly[,]" and he thought he saw it twice.

Mr. Prejean also identified Defendant in a photo lineup on January 13, 2010. The same photo was used in the news stories and in the lineup. Mr. Prejean then

2

identified Defendant at trial as the man who shot him. When asked at trial whether he was certain about his identification, Mr. Prejean replied, "Yes, sir. We were face-to-face in the truck when he pulled the gun in my face. And[,] we looked at each other when he walked across the street. He turned around and looked at me. We looked at each other in the face. That is the man."

Cherell Raymond testified that on the morning of the shooting she saw a milk truck at the A&M Grocery as she drove her vehicle on Pellerin Street. She said she saw two men getting into the milk truck and a black man in orange pants and a red shirt come around the corner. The man in the orange pants fired a gun at the driver of the milk truck and ran. Ms. Raymond, who was about twenty feet from the scene, hurriedly returned home. She could not identify the shooter beyond a description of his clothes.

Ronald Hill testified that a black man in orange pants, white Pumas (tennis shoes), and a white shirt was on the corner when they arrived at the store. Mr. Hill and Mr. Prejean went in and out of the store a few times, and the man was there each time. Mr. Hill looked at him each time he went in and came out of the store. As Mr. Hill was "putting the empties on the back of the truck," he heard Mr. Prejean call his name about three times. Mr. Hill went around the driver's side rear of the truck. He saw the man on the top step of the cab of the truck and Mr. Prejean "laid back" in the driver's seat. The man jumped or fell from the step, raised the gun, and shot inside the cab of the truck. Mr. Hill ran behind the store, and the man "took off" in the direction of where he had previously stood. Mr. Hill testified that the man's hair was in dreadlocks or twists.

Mr. Hill did not see any newscasts about the incident prior to identifying Defendant in a photo lineup on April 12, 2010. He had no conversation with

Mr. Prejean about the lineup. He chose Defendant's photo from the lineup "[a]s soon as [he] saw it[,]" and he was certain Defendant was the shooter. Mr. Hill also identified Defendant at trial. He testified that "[t]he reason I know him is because I seen [sic] his face when he first shot, and I said I would never forget him."

Shanewillow Williams testified that she knew Defendant for many years and knew him when she saw him. She further testified that on December 18, 2009, she went to the A&M Grocery and saw the milk truck. When she left the store, Defendant was standing in front of the house shown in the photograph admitted into evidence as next door to and across the street from the store. He spoke to her, using her nickname, and asked, "What's up, Mocha?" She responded, "Not much, Isiah[,]" and proceeded down the street. She then heard a gunshot and saw the handle of a gun going into a pocket of the black hoodie Defendant was wearing along with orange pants. She saw Defendant run into a gap between two houses, and she saw no one else on the street. Ms. Williams went to the police station and identified Defendant as the shooter. On April 14, 2010, she also identified Defendant as the shooter from a photo lineup.

Detective Gloria Lombard of the Jeanerette Police Department testified that when she arrived at the scene of the shooting, she found Mr. Prejean lying on the ground alongside the truck. Based on her interviews with Officer Anthony Johnson, Mr. Prejean, and Ms. Williams, she developed Defendant as a suspect. Defendant was then arrested on January 13, 2010, by the St. Martinville Police Department and the Iberia Parish Sheriff's Office. Detective Lombard subsequently identified Defendant at trial as the person she had developed as a suspect.

Officer Morman Alexander of the Jeanerette Police Department testified that he was on his way to the scene when he heard Defendant's name on the police radio. He started looking for Defendant in the neighborhood, but was unable to find him. Officer Alexander presented the photo lineup to Mr. Prejean on January 13, 2010, and testified that Mr. Prejean chose Defendant's photo "almost immediately."

Tavoris Marks testified he "was the neighborhood barber" and knew Defendant. He stated that in 2009, he cut Defendant's hair "like a one-and-a-half on the top. It's called the taper fade, one-and-a-half on the top, fade the sides and the back . . . with a line." He further testified that it would take hair two to three months to grow long enough from that style to do twists or braids; however, Mr. Marks could not recall precisely when he cut Defendant's hair in 2009.

Althea Lively, Defendant's mother, testified Defendant had a "[l]ow haircut fade" in December of 2009. She stated that she saw him two to three days prior to this incident, and "[h]e had a short haircut fade" at that time, not braids or twists. She further testified that his hair had been a little longer "whenever he got out of jail," but Ms. Lively "forgot exactly the month he got out." Ms. Lively stated that she saw her son's picture on television "with the dreads," and "other people all over the street was [sic] saying they looking for someone with dreads." She said she knew the suspect was not her son because he did not have dreads or twists, but she never told that to police. Though she did not see Defendant on the day of the shooting, she said that she was familiar with Defendant's clothes and that she never knew him to have a pair of orange pants.

Defendant testified on his own behalf. He stated that he did not shoot Mr. Prejean and that he did not have a gun that day. He further stated that more

5

than five people were hanging around the corner across from A&M Grocery on the day of the shooting, but Defendant did not have any of them testify at trial because he "[d]idn't feel the need to." Defendant said he recalled seeing the Borden's truck, but he did not recall seeing Ms. Williams. He stated that he never saw anyone getting in or out of the truck, and he could not recall where it was parked. Defendant said that he stood at the corner of Church and Pellerin streets, "[s]moking weed, texting on the phone," and that when he heard a gunshot, he "was high and paranoid and took off running" to keep from being shot because he was on parole for aggravated flight in 2006 and was "not allowed to smoke weed."

Defendant stated that when he was released on September 5, 2009, he had short dreadlocks, but he cut his hair in a "taper fade" from September until he was arrested after the shooting. He testified that he had "never owned a pair of orange pants" and had never worn "orange pants outside of jail." Defendant testified that Mr. Prejean, Mr. Hill, and Ms. Williams were all lying at trial and that he was the only one telling the truth.

## PROCEDURAL HISTORY

On April 12, 2010, Defendant was charged with attempted second degree murder, violations of La.R.S. 14:27 and 14:30.1, and with attempted armed robbery, violations of La.R.S. 14:27 and 14:64, as the result of a shooting incident on December 18, 2009, at the A&M Grocery in Jeanerette, Iberia Parish, Louisiana. A jury found Defendant guilty as charged on August 23, 2012.

On September 7, 2012, the State filed a bill of information, alleging Defendant was previously convicted of aggravated flight from an officer, a violation of La.R.S. 14:108.1, on July 6, 2007. The bill alleged that the jury's finding of guilty of attempted second degree murder was Defendant's second

6

felony conviction and sought enhancement of Defendant's sentence pursuant to La.R.S. 15:529.1.

On October 30, 2012, the trial court initially sentenced Defendant to twenty years at hard labor without parole, probation, or suspension of sentence for attempted second degree murder and to ten years at hard labor without parole, probation, or suspension of sentence for attempted armed robbery. Both sentences were ordered to run concurrently.

The next day, on October 31, 2012, the trial court set aside Defendant's twenty-year sentence for attempted second degree murder and, having found that he was a second felony offender, imposed a new sentence of twenty-five years at hard labor without benefit of parole, probation, or suspension of sentence, the minimum sentence possible according to La.R.S. 15:529.1. This sentence was ordered to run concurrently with the sentence for attempted armed robbery. Defendant has timely appealed his convictions, but not his sentences.

## ERRORS PATENT

In accordance with La.Code Crim.P. art. 920, all appeals are reviewed for errors patent on the face of the record. After reviewing the record, we find no errors patent.

## ASSIGNMENTS OF ERROR

Defendant presents the following assignments of error:

> [1.] As the State failed to prove the identity of the perpetrator of the attempted robbery and shooting of Russell Prejean beyond a reasonable doubt, the State failed to prove that Isiah Lively was guilty of Attempted Armed Robbery or Attempted Second Degree Murder.
>
> [2.] The State failed to establish that Isiah Lively intended to kill Russell Prejean; therefore, the State failed

7

to meet its burden of proving Isiah Lively was guilty of Attempted Second Degree Murder.

[3.]    The trial court erred in denying the defense request for a special instruction on eyewitness identification. The trial court further erred in failing to instruct the jury on how to evaluate eyewitness identification testimony.

[4.]    The trial court erred in failing to suppress Russell Prejean's identification of Isiah Lively which was tainted by news accounts of the crime containing Isiah Lively's photograph.

## ASSIGNMENT OF ERROR NO. 1

Defendant argues that the State failed to prove his guilt because it did not prove the shooter's identity beyond a reasonable doubt. He admitted to being in the area at the time of the shooting, but testified that he only heard the shot and ran. He contends his hair style at the time did not match the hair style of the shooter, as described by eyewitnesses, and that he did not own any clothing that matched the description of what the shooter wore.

The standard of review in a sufficiency of the evidence claim is "whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found proof beyond a reasonable doubt of each of the essential elements of the crime charged." *State v. Leger*, 05-11, p. 91 (La. 7/10/06), 936 So.2d 108, 170, *cert. denied*, 549 U.S. 1221, 127 S.Ct. 1279 (2007) (citing *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781 (1979); *State v. Captville*, 448 So.2d 676 (La.1984)). The *Jackson* standard of review is now legislatively embodied in La.Code Crim.P. art. 821. It does not allow the appellate court "to substitute its own appreciation of the evidence for that of the fact-finder." *State v. Pigford*, 05-477, p. 6 (La. 2/22/06), 922 So.2d 517, 521 (citing *State v. Robertson*, 96-1048 (La. 10/4/96), 680 So.2d 1165; *State v. Lubrano*, 563 So.2d

847 (La.1990)). The appellate court's function is not to assess the credibility of witnesses or reweigh the evidence. *State v. Smith*, 94-3116 (La. 10/16/95), 661 So.2d 442.

The factfinder's role is to weigh the credibility of witnesses. *State v. Ryan*, 07-504 (La.App. 3 Cir. 11/7/07), 969 So.2d 1268. Thus, other than insuring the sufficiency evaluation standard of *Jackson*, "the appellate court should not second-guess the credibility determination of the trier of fact[,]" but rather, it should defer to the rational credibility and evidentiary determinations of the jury. *Id.* at 1270 (quoting *State v. Lambert*, 97-64 (La.App. 3 Cir. 9/30/98), 720 So.2d 724). Our supreme court has stated:

> However, an appellate court may impinge on the fact finder's discretion and its role in determining the credibility of witnesses "only to the extent necessary to guarantee the fundamental due process of law." *State v. Mussall,* 523 So.2d 1305, 1310 (La.1988). In determining the sufficiency of the evidence supporting a conviction, an appellate court must preserve "'the factfinder's role as weigher of the evidence' by reviewing 'all of the evidence . . . in the light most favorable to the prosecution.'" *McDaniel v. Brown,* 558 U.S. ___, ___, 130 S.Ct. 665, 674, 175 L.Ed.2d 582 (quoting *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979)). When so viewed by an appellate court, the relevant question is whether, on the evidence presented at trial, "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson,* 443 U.S. at 319, 99 S.Ct. at 2789. Applied in cases relying on circumstantial evidence, . . . this fundamental principle of review means that when a jury "reasonably rejects the hypothesis of innocence presented by the defendant[ ], that hypothesis falls, and the defendant is guilty unless there is another hypothesis which raises a reasonable doubt." *State v. Captville,* 448 So.2d 676, 680 (La.1984).

*State v. Strother*, 09-2357, pp. 10-11 (La. 10/22/10), 49 So.3d 372, 378.

"Second degree murder is the killing of a human being: (1) When the offender has a specific intent to kill or inflict great bodily harm; or (2) When the offender is engaged in the perpetration or attempted perpetration of . . . armed

9

robbery . . . ." La.R.S. 14:30.1(A). "Armed robbery is the taking of anything of value belonging to another from the person of another or that is in the immediate control of another, by use of force or intimidation, while armed with a dangerous weapon." La.R.S. 14:64(A). A person attempts a crime when he, "having a specific intent to commit a crime, does or omits an act for the purpose of and tending directly toward the accomplishing of his object[.]" La.R.S. 14:27(A).

Our law requires the State "to negate any reasonable probability of misidentification[]" when a key issue in a case is the defendant's identity. *State v. Hughes*, 05-992, p. 5 (La. 11/29/06), 943 So.2d 1047, 1051 (citing *State v. Weary*, 03-3067 (La. 4/24/06), 931 So.2d 297, *cert. denied*, 549 U.S. 1062, 127 S.Ct. 682 (2006)). However, "[p]ositive identification by only one witness is sufficient to support a conviction. It is the factfinder who weighs the respective credibilities of the witnesses, and this court will generally not second-guess those determinations." *Id.* (citations omitted).

Three eyewitnesses observed this shooting. Mr. Prejean looked into the face of the man who shot him, and he identified Defendant from a photo lineup and at trial. Although he saw Defendant's picture on television prior to viewing the lineup, Mr. Prejean testified that he recognized Defendant at the time he saw the television picture. Mr. Hill saw the shooter twice and identified Defendant from a photo lineup without seeing his picture on television. Ms. Williams had known Defendant for many years. While she did not actually see Defendant shoot the gun, she spoke to him immediately before the shooting and later saw him put the handle of a gun into a hoodie pocket immediately after the shooting. All three witnesses described the shooter's clothing to include orange pants, although they described his shirt differently.

10

None of these eyewitnesses saw anyone else in the area. Only Defendant testified that he saw five or more people hanging around with him on the corner while he smoked marijuana. The jury obviously did not believe Defendant's testimony. We find that the State sufficiently proved all the elements of the offenses, including the identity of Defendant. Thus, this assignment of error lacks merit.

## ASSIGNMENT OF ERROR NO. 2

Defendant next argues the State failed to prove that he had the specific intent to kill Mr. Prejean and thereby failed to prove his guilt. "Specific criminal intent is that state of mind which exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act." La.R.S. 14:10(1).

> Because specific intent is a state of mind, it does not need to be proven by fact; it may be inferred from the circumstances and the actions of the defendant. *State v. Allen,* 99-320 (La.App. 5 Cir. 7/27/99), 742 So.2d 949. The existence of specific intent is for the trier of fact to determine, and review of this determination is correctly made under the *Jackson* standard. *Id.*

*State v. Megason*, 10-112, p. 5 (La.App. 3 Cir. 10/6/10), 47 So.3d 31, 34. "It is well-settled that the act of pointing a gun at a person and firing the gun is an indication of the intent to kill that person." *State v. Thomas*, 10-269, p. 7 (La.App. 3 Cir. 10/6/10), 48 So.3d 1210, 1215, *writ denied*, 10-2527 (La. 4/1/11), 60 So.3d 1248, *cert. denied*, ___ U.S. ___, 132 S.Ct. 196 (2011).

Mr. Prejean testified at trial that he "looked at a .45 in [his] face" and that Defendant then shot him in the leg. We find that pointing a gun in someone's face and then shooting him, albeit the bullet entered the leg, is an indication of intent to kill.

In *State v. Owens*, 606 So.2d 876 (La.App. 2 Cir. 1992), the defendant pointed a pistol at the victim's chest. As he fired the pistol, a bystander hit the defendant's arm and caused the first round to miss. The victim pushed the defendant and tried to retreat, but the defendant fired three more shots. The victim was hit below the left knee and on the right foot. The defendant then fled. At his trial for attempted second degree murder, the defendant claimed he shot at the floor, intending to hit the victim's feet and legs, and that he had the opportunity to shoot the victim in the chest, but did not. Thus, he argued that this proved his lack of specific intent to kill. The second circuit found that the jury obviously believed the other witnesses and found the defendant guilty.

This court has held "[a]iming a firearm directly at a victim is indicative of intent to kill or inflict great bodily harm." *State v. Clark*, 93-1470, p. 3 (La.App. 3 Cir. 10/5/94), 643 So.2d 463, 466, *writ denied*, 94-2715 (La. 2/9/95), 649 So.2d 418 (citing *State v. Maxey*, 527 So.2d 551 (La.App. 3 Cir. 1988), *writ denied*, 541 So.2d 868 (La.1989)). However, this court has also recognized "that a shooting at close range does not prove specific intent." *State v. Carmouche*, 12-1052, pp. 15-16 (La.App. 3 Cir. 4/3/13), 117 So.3d 136, 146.

In *Carmouche*, this court looked to additional facts to conclude the defendant possessed the specific intent to kill. The defendant and the victim had an acrimonious relationship and had scuffled just prior to the shooting when the victim threw the first punch. Thus, the defendant had a motive for the shooting. Also, the defendant fled the scene and the city to avoid capture.

Here, eyewitness testimony shows Defendant put the gun in Mr. Prejean's face—certainly an action that could have led to Mr. Prejean's death. However, when Defendant actually fired the gun, he hit Mr. Prejean in the upper leg.

We find that Defendant armed himself with the motive to rob Mr. Prejean at gunpoint. He then shot Mr. Prejean at close range. He subsequently fled the scene and went to New Orleans, never contacting the police to report the gunfire he said he heard. We find that these facts clearly indicate that Defendant had the specific intent to kill Mr. Prejean. This assignment of error lacks merit.

## ASSIGNMENT OF ERROR NO. 3

Defendant contends that the trial court erred when it denied his request for a special instruction dealing with eyewitness identification. Further, Defendant argues that the trial court erred by failing to specifically instruct the jury on how to evaluate eyewitness identification.

The record contains Defendant's lengthy proposed instruction. The gist of Defendant's argument on appeal is that eyewitness identifications can be imperfect according to *State v. Young*, 09-1177 (La. 4/5/10), 35 So.3d 1042, *cert. denied*, __ U.S. __, 131 S.Ct. 597 (2010). *Young*, however, dealt with expert testimony about factors that might influence the reliability of eyewitness identifications. The Louisiana Supreme Court recognized "eyewitness identifications can be imperfect[]" and barred the expert testimony because it would not assist the jury. *Id.* at 1049.

The trial court here pointed out that Defendant did not tender an expert "to come and talk about the potential fallacies of eyewitness testimony." Rather, the specific instruction "talk[ed] about what the experts say is part of their science and research. So if [an expert is] not going to say it, you certainly can't get it in through instructions."

"A requested special charge shall be given by the court if it does not require qualification, limitation, or explanation, and if it is wholly correct and pertinent. It

13

need not be given if it is included in the general charge or in another special charge to be given." La.Code Crim.P. art. 807. In our examination of Defendant's proposed jury instruction, we find that it included a great deal of qualification and explanation. Thus, it is not the type of charge envisioned by La.Code Crim.P. art. 807.

In *State v. Velez*, 588 So.2d 116 (La.App. 3 Cir. 1991), *writs denied*, 592 So.2d 408 (La.1992), *cert. denied*, 505 U.S. 1220, 112 S.Ct. 3031 (1992), the defendant requested a jury instruction setting out the factors the jury must consider when evaluating the testimony of an identifying witness. The trial court denied the request, but charged the jury "to consider the witnesses' reasons for testifying, manner while testifying, and whether their testimony is supported or contradicted by other evidence." *Id.* at 137. This court found no error in the charge given or in the trial court's failure to include the requested charge.

On this issue in the instant case, the trial court instructed the jury as follows:

> In evaluating the testimony of a witness, you may consider the witness' ability and opportunity to observe and remember the matter, any time period between that, that elapsed between the observation and the statements given, the manner while testifying, any reason for testifying in favor or against the State or the defendant, and the extent to which the testimony is supported or contradicted by other evidence. Again, you must consider the credibility of the defendant's testimony just as you do all other witnesses. However, the testimony of a witness may be discredited by showing that the witness made a prior statement which contradicts or is inconsistent with his or her present testimony. Such prior statements are admitted only to attempt to discredit the witness, not to show that the statements are true.

We find that the jury had the opportunity to observe the eyewitnesses and determine whether their identifications were flawed. The trial court instructed the jury with language almost identical to the language of the instruction approved by

14

this court in *Velez*, 588 So.2d 116. Accordingly, we find that Defendant's argument and assignment of error lack merit.

## ASSIGNMENT OF ERROR NO. 4

Defendant argues that the trial court erred by failing to suppress Mr. Prejean's identification because it was tainted by news accounts of the crime containing Defendant's photograph. He contends that the totality of the circumstance shows the likelihood of Mr. Prejean's influence from the news story which identified Defendant as the shooter.

"A defendant who seeks to suppress an identification must prove that the identification was suggestive and that there was a likelihood of misidentification in the identification procedure." *Velez*, 588 So.2d at 134. The *Velez* defendant contended a witness's identification was unduly suggestive because the witness viewed a passport photo of the defendant prior to viewing a lineup. This court found the witness observed individuals at the murder scene for seven to ten minutes, gave a description consistent with that of the defendant, and identified the defendant at trial independently of the lineup. This court opined, "[c]onsidering these facts, the suggestive nature of [the witness]'s identification goes to the weight, rather than the admissibility of the identification[]" and found "no proof of a likelihood of misidentification." *Id.* at 135.

Here, Mr. Prejean testified at the hearing on the motion to suppress regarding what he saw on television:

> I saw once that I can remember because I was heavily doped up, you know, with all the pain I was going through[,] and I did see his picture one time briefly[,] and I think it was on a couple of times[,] but I had people that was there while I was – the news was on and I was eating supper. So[,] I just briefly looked and continued eating and talking to them.

15

Mr. Prejean recognized the photo as that of the person who shot him. He chose the same photo from the lineup on January 13, 2010, as the photo of the man who shot him, not as the man whose photo he had seen on television. Mr. Prejean's description was consistent with relevant portions of the descriptions of the other eyewitnesses who said the shooter was wearing orange pants and his hair in twists or braids.

Ms. Williams had known Defendant for many years at the time of the shooting. She spoke to him and he replied; she heard a shot; she saw him place the handle of a gun inside his clothing immediately thereafter; and, she saw him flee the scene. Ms. Williams gave the name of the shooter. Police put Defendant's photo on television because it matched the name she gave them. The jury obviously believed this testimony.

We find that the allegedly suggestive nature of Mr. Prejean's identification of Defendant, if any, goes to the weight and not to the admissibility of the evidence as in *Velez*, 588 So.2d 116. Further, in light of the other evidence concerning the identification of Defendant, particularly Ms. Williams' testimony, we find the totality of the evidence more than sufficient to convict Defendant, even without Mr. Prejean's identification. This assignment of error likewise lacks merit.

## DISPOSITION

We affirm Defendant's convictions and adjudication.

**AFFIRMED.**